Ronald D. CHILDRESS; Peggy Childress, Plaintiffs–Appellants,

v.

GRESEN MANUFACTURING CO., a wholly owned subsidiary of Dana Corp., Defendant–Appellee.

No. 88–1818.

United States Court of Appeals, Sixth Circuit.

Argued April 20, 1989.

Decided Oct. 31, 1989.

Larry A. Smith (argued), Lakin, Worsham & Victor, Southfield, Mich., for plaintiffs-appellants.

Thomas G. Cardelli (argued), Taylor, Braun, Manganello & Cardelli, Detroit, Mich., for defendant-appellee.

Before WELLFORD and GUY, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

This case arises out of a tragic accident in which plaintiff Ronald Childress lost both legs and a thumb while using a log splitter manufactured by LaFont Log Splitting Company ("LaFont"). The log splitter causing the injury incorporated as a component part a hydraulic valve designed and manufactured by defendant Gresen Manufacturing Company ("Gresen").

Plaintiffs appeal from the district court's summary judgment which was based on the premise that a component part manufacturer does not have a duty under Michigan law to analyze the safety of a completed product that incorporates its nondefective component part. Plaintiffs attempt to base their case on two distinct legal theories. First, they claim that the valve was defectively designed, not because it malfunctioned or deviated from its intended operation, but because when incorporated into the log splitter it caused the log splitter to function in an unreasonably dangerous manner. Second, they claim that the valve was negligently supplied to LaFont because Gresen knew or should have known that its incorporation into LaFont's log splitter would create an unreasonable risk of danger to the user of the log splitter. Before examining the merits of these ·assertions, some background facts must be reviewed.[1]

A typical log splitter consists of numerous component parts. The main section of the log splitter is the beam. The beam holds the log in place while the log is being

---

1. We integrate herein the description of a log splitter's structure and operation set forth in the district court's memorandum order and opinion of July 26, 1988, granting summary judgment. That opinion is reported at 690 F.Supp. 587 (E.D.Mich.1988).

split. At one end of the beam is a wedge. The wedge is a knife-like object that remains in a stationary position. At the opposite end of the beam is a push pad or ram. The ram is a mobile object which moves along the beam toward the wedge. The ram forces the log into the wedge, thereby causing the log to split. The ram is connected to a cylinder. The cylinder obtains its power from a hydraulic fluid pump. A control valve is used to channel the fluid and the cylinder in a desired direction.

An operator activates movement of the ram by depressing one or two control levers, depending on the particular design of the log splitter used. A log splitter is said to have a "deadman's control" if the ram halts its movement toward the wedge upon release of pressure on the lever(s), whereupon the ram either stops or automatically retracts. The log splitter involved here, like the model manufactured by LaFont prior to incorporation of the Gresen valve, did not have a deadman's control.[2] Therefore, once the lever was depressed, the ram would automatically extend toward the wedge whether or not the operator continued to apply pressure to the lever. This movement could be interrupted only by manually resetting the lever. Once the ram on the splitter involved here was fully extended, the lever would automatically spring into the reverse position, causing the ram to retract. The lever would then settle in the neutral position.

Ronald Childress was employed by a person in the business of selling firewood. His job assignment for about a month prior to the accident was to split logs. On February 3, 1984, Childress placed a log on the beam of the splitter. After pulling the lever to begin the splitting process, Childress let go of the lever and held the log in place with his right hand so that it would not become dislodged. As the ram moved toward the wedge, Childress' right thumb became caught between the log and the wedge, causing the thumb to be amputated. He became weak and unstable and fell across the beam. Childress was unable to reach the control lever to stop the progression of the ram. Consequently, the ram continued forward, forcing his legs against the wedge. Childress' injuries were so extensive that it eventually became necessary to amputate both legs.

Gresen was requested by LaFont to manufacture a valve for use in its log splitter with the following specifications: 1) spring extension; 2) knock-out; 3) pressure setting; and 4) handle location. Gresen assigned the valve the number CP–4119–A to designate that it was made in accordance with LaFont's specifications. Plaintiffs presented evidence that LaFont's employees lacked the expertise necessary to supply technical specifications for a valve design, though Gresen's evidence is uncontradicted on the point that LaFont made no request for Gresen to provide any design or safety analysis for use of the valve on a log splitter. The valve as supplied consisted of a spring extended valve, with a hydraulic knock-out positioner added to it. In order to make the cylinder retract after full extension of the ram toward the wedge, Gresen modified the knock-out positioner to cause the valve to return to the opposite power position rather than to neutral. According to testimony by plaintiffs' expert, the spring extended valve without the addition of a knock-out positioner would have functioned in LaFont's log splitter like a deadman's control in that the ram would automatically have ceased its forward movement upon release of the operating lever. The knock-out positioner caused the ram to continue extending toward the wedge even if the operator released the lever. The positioner, as modified for LaFont, also reversed the direction of the ram upon full extension. Prior to working with LaFont, Gresen had supplied spring extended with hydraulic knock-out valves to other completed product manufacturers. Such valves are commonly used in equipment such as fork lift trucks and garbage bin dump trucks.

---

**2.** Several features of the LaFont log splitter were altered when the Gresen valve was added, including the ability to actuate a single automatic cycle of log splitting with one lever instead of two.

Plaintiffs make much of the fact that Gresen modified the spring extended valve by adding the altered knock-out positioner prior to supplying it to LaFont. Gresen added the positioner to the valve in order to meet LaFont's specifications. This does not make Gresen a "designer" of the component part. The uncontradicted evidence shows that a spring extended valve with a knock-out positioner is a distinct component with recognized features that are useful in a variety of applications. The valve Gresen supplied is properly identified as a single unit consisting of a spring extended with knock-out valve. In any event, the fact that an unaltered spring extended valve would cease operation upon release of pressure is not in itself intended to be a "safety feature" of that valve. Removing that characteristic by adding a knock-out positioner (even when the positioner has been modified to facilitate a function unrelated to the automatic progression of the ram toward the wedge) cannot properly be described as destroying a "safety feature" of the valve, as plaintiffs attempt to do.

We also agree with the district court that there is no need to examine this case under two theories, negligent supply and defective design. In a case of defective design, the product has been manufactured in accordance with its intended design but is not sufficiently safe. *Prentis v. Yale Manufacturing Co.*, 421 Mich. 670, 683, 365 N.W.2d 176, 182 (1984). Plaintiffs state that the valve functioned as designed but was defectively designed because it caused the log splitter to operate in an unreasonably dangerous manner. There is no allegation that there was anything inherently dangerous about the Gresen valve before it was integrated into any completed product; indeed, there is evidence that the same valve had previously been supplied to manufacturers for other applications in which no allegation of danger had surfaced. It was only from the supply of the valve to LaFont, and LaFont's use of the valve in the manufacture of its log splitter, that any danger may have arisen. Plaintiffs' argument that furnishing the valve to LaFont exposed Gresen to liability for a defect in the LaFont log splitter is central to both of plaintiffs' theories.

Therefore, we must examine whether the manufacturer of a component part, supplying the part with knowledge of its ultimate function in an allegedly dangerous finished product pursuant to the design requested by the manufacturer of the finished product, may be liable under Michigan law for negligently supplying that part. In *Jordan v. Whiting Corp.*, 49 Mich.App. 481, 212 N.W.2d 324 (1973), *rev'd in part on other grounds*, 396 Mich. 145, 240 N.W.2d 468 (1976), the court held that because a component part manufacturer could not have known how its parts were to be incorporated into the final product, that manufacturer had no duty to anticipate any resulting defectively designed product and therefore could not be held liable on the basis that it negligently supplied its product. *Id.* at 486, 212 N.W.2d at 328. In *Scott v. Allen Bradley Co.*, 139 Mich.App. 665, 362 N.W.2d 734 (1984), the manufacturer of a switch which it knew or should have known would be used as a power press mode selector was held to be liable for injury resulting when an operator accidentally switched the machine to the "on" position, causing the machine to operate on an automatic cycle. *Id.* at 671, 362 N.W.2d at 737. The defect involved in *Scott* was the absence of a safety guard on the switch, available for approximately one dollar, that would have virtually eliminated the risk of inadvertently tripping the switch. *Id.* at 671, 362 N.W.2d at 737–38. Plaintiffs here allege a defect in the internal design of the valve. Plaintiffs would require the component part manufacturer to supply a different valve that would cause the finished product to operate less dangerously.

In granting summary judgment, the district court distinguished *Scott* on the ground that liability there

was premised upon a defect in the design of the component part itself, i.e. the failure to incorporate a safety device. No such claim is made in the case at bar. Plaintiffs do not offer evidence to suggest that Gresen improperly designed the

spring extension valve or that the valve should have incorporated some safety device. Rather, it is Plaintiffs' contention that Gresen was negligent in supplying a non-defective component part to LaFont without analyzing the overall design of the completed product.

690 F.Supp. at 592. We agree with the district court that this case is distinguishable from *Scott* because in *Scott* there was an actual defect in the component part, whereas in this case the valve was alleged to be misapplied rather than defectively designed. We further agree with the district court that the language in *Scott* is overly broad in stating that a manufacturer of a component part with knowledge of the final design of the completed product is responsible for the safety of the final product if the component part becomes potentially dangerous in its ultimate use. 690 F.Supp. at 592 n. 1. The district court reasoned that such a standard would be contrary to public policy, as it would encourage ignorance on the part of component part manufacturers or alternatively require them to "retain an expert in the client's field of business to determine whether the client intends to develop a safe product." *Id.*

We observe that there is a marked difference between knowing the identity of the equipment into which a component part will be integrated and anticipating any hazardous operation by that equipment that might be facilitated by the addition of the component part. Indeed, extending the duty to make a product safe to the manufacturer of a non-defective component part would be tantamount to charging a component part manufacturer with knowledge that is superior to that of the completed product manufacturer. The law in Michigan does not go this far. The court in *Jordan v. Whiting Corp., supra,* stated, "The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not—at least yet—extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another." *Jordan, supra,* 49 Mich.App. at 486, 212 N.W.2d at 328. *Accord, Wenrick v. Schloemann–Siemag Aktiengesellschaft,* 361 Pa.Super. 137, 522 A.2d 52 (1987), *appeal granted,* 518 Pa. 643, 542 A.2d 1371 (1988); *Curry v. Louis Allis Co.,* 100 Ill.App.3d 910, 56 Ill. Dec. 174, 427 N.E.2d 254 (1981). Therefore, we agree with the district court that under Michigan law a component part supplier has no duty, independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its nondefective component part.

For the reasons stated above, the judgment of the district court is AFFIRMED.