**Annamarie LAMONTAGNE, Doreen A. Festa and Susan B. Pregler, Plaintiffs–Appellants,**

**v.**

**E.I. DU PONT DE NEMOURS & COMPANY, INC., Defendant–Appellee.**

**Nos. 1907–1909, Docket 93–9165, 93–9169 and 93–9171.**

United States Court of Appeals, Second Circuit.

Argued June 29, 1994.

Decided Dec. 5, 1994.

---

David A. Reif, New Haven, CT (Elizabeth L. McMahon, Susman, Duffy & Segaloff, P.C., on the brief), for plaintiffs-appellants.

Edward M. Mansfield, Phoenix, AZ (Barry Fish, Bret A. Maidman, Lewis & Roca, Phoenix AZ, Ross F. Schmucki, Wilmington, DE, Harry M. Stokes, Wiggin & Dana, New Haven, CT, on the brief), for defendant-appellee.

Before: KEARSE and ALTIMARI, · Circuit Judges, and SEYBERT, District Judge *.

KEARSE, Circuit Judge:

Plaintiffs Annamarie LaMontagne, Doreen A. Festa, and Susan B. Pregler appeal from a judgment of the United States District Court for the District of Connecticut, José A. Cabranes, then-*District Judge* **, dismissing their claims seeking damages against defendant E.I. Du Pont De Nemours & Co. ("Du Pont") under the Connecticut Product Liability Act, Conn.Gen.Stat.Ann. §§ 52–572m *et seq.* (West 1991) ("CPLA"), on theories of negligence, failure to warn, and breach of implied warranty in connection with plaintiffs' receipt of artificial medical prostheses made by Vitek, Inc. ("Vitek"), using a Du Pont plastic known as "Teflon." The district court granted Du Pont's motion for summary judgment, dismissing plaintiffs' claims principally on the grounds (a) that Du Pont neither knew nor should have known that the device was unreasonably dangerous, and (b) that Du Pont adequately disclaimed any warranty as to the merchantability of Teflon for use in medical implants. On appeal, plaintiffs contend that their failure-to-warn and negligence theories should not have been rejected because there were genuine issues to be tried as to Du Pont's knowledge. Du Pont contends that the district court's rulings in its favor were correct and that the court could properly have granted it summary judgment on other grounds as well, including preemption of the CPLA by the Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (1988 & Supp. V 1993) ("MDA"). For the reasons below, we conclude that the district court correctly ruled as a matter of law that plaintiffs failed to show a duty on the part of Du Pont.

---

* Honorable Joanna Seybert of the United States District Court for the Eastern District of New York, sitting by designation.

** When judgment was entered, Judge Cabranes was a District Judge. He became a judge of the United States Court of Appeals for the Second Circuit in September 1994.

## I. BACKGROUND

Many of the facts and events are not substantially in dispute. In the late 1960s, the founder of Vitek, a company unrelated to Du Pont except as a customer, developed a material known as "Proplast," one component of which was a form of Teflon. In the 1980s, Vitek fashioned a Proplast implant for the temporomandibular joint ("TMJ") of the human jaw, which connects the upper and lower parts of the jaw. After receiving approval to do so from the United States Food and Drug Administration ("FDA") in 1983, Vitek began to market its Proplast TMJ implant.

In 1985 or 1986, each plaintiff received a Proplast TMJ implant. They subsequently developed health problems that they attribute to those implants. Vitek, after being served with numerous product liability suits related to the Proplast TMJ implants, filed for bankruptcy protection. Plaintiffs brought their lawsuits against Du Pont in state court, alleging principally that Du Pont had been negligent in selling Teflon to Vitek, had failed to issue adequate warnings of the risks associated with the use of Teflon in the Proplast TMJ implants, and had breached implied warranties of merchantability and fitness for a particular use. The state-court suits were removed to federal court, with jurisdiction premised on diversity of citizenship, and were consolidated into the present action.

Following a period of discovery, Du Pont moved for summary judgment, contending principally that plaintiffs' claims were preempted by the MDA. Alternatively Du Pont argued, *inter alia*, that it had no legal responsibility because (a) Vitek, in creating Proplast, substantially altered Du Pont's Teflon, thereby severing any chain of liability leading to Du Pont, (b) Du Pont, as a bulk supplier of raw material, had no duty to assure the safety of the Proplast TMJ implants or to warn of danger from the use of those implants, and (c) Du Pont neither knew nor reasonably should have known of the hazards in the use of the implants. The record, with permissible inferences drawn in favor of plaintiffs, reveals the following history of the development of Proplast.

### A. Du Pont and Teflon; Vitek and Proplast

For more than 50 years, chemical companies have manufactured plastic materials incorporating polytetrafluoro-ethylene ("PTFE"), which has uses in numerous products ranging from frying pans, to submarine piston rings, to artificial human veins. Du Pont sells its PTFE under the trademark Teflon.

From 1959 to 1966, Dr. Charles Homsy was employed by Du Pont as an engineer and had extensive experience with Teflon and related products. During his tenure, Homsy spent "personal time" investigating the possibility of using certain plastic resins related to Teflon for medical applications and eventually suggested that the Du Pont Plastics Department explore biomedical uses for Teflon. (Homsy Memorandum dated January 3, 1966 re "Orthopedic Prostheses of Polymeric Materials, Especially 'Teflon' Fluorocarbon Resin[:] A Preliminary Venture Proposal.") The Plastics Department promptly rejected Homsy's proposal, concluding that the likely profit was small and was in any event insufficient to justify the risk of major medical liability:

> The conclusion we have come to and the conclusion I must now come to is that the Plastics Department has no interest in embarking on a venture to fulfill this need. For one thing, I am sure it could be demonstrated that it would not be a profitable venture for Du Pont. Above all, however, ... we have not been given much encouragement from the Legal Department as to how we would face the consequences of the liability involved in operating in this area. For this reason alone I am not willing to pursue the matter any further.

(O.G. Youngquist Memorandum dated January 7, 1966, re Orthopedic Prostheses of Polymeric Materials.)

Unable to interest Du Pont in pursuing medical applications, Homsy resigned from the company and became Director of the Prosthesis Research Laboratory at The Methodist Hospital ("Hospital") in Houston, Texas, with a view toward investigating the development of plastic materials for use in human implants. As part of his investiga-

tions, Homsy purchased Teflon from Du Pont.

Du Pont was aware that Homsy's purchases of Teflon were linked to his investigations into the possible use of Teflon as a component of human implants. In 1967, having been advised that Homsy would be ordering a total of 60 pounds of Teflon resins, Du Pont wrote to the Hospital's purchasing agent, sending a copy to Homsy, stating in part as follows:

> Since the proposed use of these industrial materials is in the medical field, it is necessary for us to write you as follows.
>
> I should point out that Du Pont "Teflon" is not made for medical use. While we carry out such tests as are needed to protect the ordinary users of our products, we do not perform the detailed long-time studies which should be made before these products are employed for purposes such as in medicine and surgery. Accordingly, we are reluctant to encourage the use of "Teflon" for surgical purposes.

(Du Pont letter dated March 13, 1967 ("Du Pont 1967 Letter"), at 1.) After discussing several studies suggesting that the use of Teflon for medical implants might be hazardous, including a study by British researcher Sir John Charnley published in 1963 in the United Kingdom's leading medical journal, *Lancet,* the Du Pont 1967 Letter concluded as follows:

> Since we have no knowledge of the suitability of "Teflon" for your medical use, and since the contemplated use is one that you propose and has not been recommended by us, it must be understood that you are relying upon your own medical judgment as to its safety and effectiveness. Therefore, we will provide you with material that you are ordering and such "Teflon" as you order in the future only on the understanding that you assume full responsibility for any consequences which may result directly or indirectly from its use.
>
> Accordingly, if you are in agreement with the conditions outlined above, will you indicate your acceptance of these conditions by having an authorized representative of your hospital sign and return to us the enclosed copy of this letter.

(Du Pont 1967 Letter at 2.) A Hospital representative signed and returned the letter as requested.

Homsy had previously been aware of the studies discussed in the Du Pont 1967 Letter, and he responded that though he understood Du Pont's need "to require disclaimers from medical users," he believed the existing literature resulted from an "incomplete understanding of polymer applications." (Homsy letter to Du Pont dated March 20, 1967, at 2.) He stated in part that

> Charnley's report of tissue reaction from abraded particles of TFE, in the absence of comparative data, should rationally be ascribed to the mechanical form of the material and not to specificity of reaction to TFE polymer (Lancet v. 11, p. 1379–1963). Charnley's use of [pure] TFE for hip prostheses would naturally dispose to abrasive wear of the polymer. He will be here in April for a symposium on the "Painful Hip"; at that time I hope to inquire further on his work.

(*Id.*)

Research evaluations as to the safety of using Teflon in implants were mixed and undefinitive. At least one study of which Du Pont was aware, in addition to the Charnley study, concluded that artificial hip joints made of Teflon were unsafe when implanted in dogs. Leidholt & Gorman, "Teflon Hip Prostheses in Dogs," *The Journal of Bone & Joint Surgery* 1414, 1420 (1965) ("Leidholt & Gorman"). Such studies were not directly transferrable to jaw replacement implants, however, in part because the hip joint bears substantially greater weight than the temporomandibular joint, *see, e.g.,* Cook, "Teflon implantation in temporomandibular arthroplasty," *Oral Surgery* 706, 707 (1972), and in part because experiments using pure Teflon did not foreclose successful use of a "modified Teflon, impregnated with glass, ceramic, steel, or carbon," Leidholt & Gorman at 1420.

In November 1968, Homsy contacted Du Pont again, expressing interest in experimenting with various types of Teflon fibers in his prosthesis development program. Du

Pont's Patent Division responded in part as follows:

We should like to point out that our fibers are manufactured for textile uses. We do not consider ourselves medically competent to judge their suitability for medical applications and we have not conducted the long-term tests required to satisfy us of their safety in such uses. The development of medical applications for our fibers has been entirely the responsibility of the medical profession.

(Du Pont Patent Division letter to Homsy dated January 2, 1969.)

Homsy's experimentation with Teflon resulted in his invention of the material he called Proplast, which he patented in 1976. His seven-step manufacturing process consisted in part of mixing Teflon resins and fibers with carbon fibers or aluminum oxide, sodium chloride, and other materials, and then manipulating the substance by means of, *inter alia,* filtering, compression, and high-temperature sintering. Although this process did not alter the actual Teflon molecules used in the process, Proplast differed substantially from Teflon both because of the incorporation of other material and because of the physical manipulation. In particular, Proplast was substantially more porous than Teflon, and this encouraged the ingrowth of human tissue.

Homsy formed Vitek to market various forms of human implants constructed of Proplast. The first Proplast implants apparently were reliable, and in the 1970s Vitek successfully manufactured and marketed several types of implants. Du Pont knew of Vitek's use of Proplast in human implants. A Du Pont sales representative's file memorandum reflected a call to Vitek "[t]o determine status of Homsy's new business." (G. Ostroot Memorandum dated October 5, 1972.) The memorandum stated, in part, that

Homsy's new "TEFLON"/carbon implant material called "PROPLAST" has been licensed to Smith, Kline & French and appears to have obtained acceptance in a wide range of human implant applications. Vitek will shortly be producing basic shapes of "PROPLAST" to supply every hospital in the world.

(*Id.*)

After the MDA became effective in 1976, Vitek applied to the FDA for approval of the use of Proplast in various medical treatments, including the coating of metal surgical implants in the temporomandibular joint, *see* 45 Fed.Reg. 86032 (Dec. 30, 1980). Three FDA expert Device Classification Panels, within their respective areas of expertise, *see id.* at 86031–32 (Dental Device Classification Panel); 47 Fed.Reg. 2818–19 (Jan. 19, 1982) (Ear, Nose, & Throat Device Classification Panel, and General & Plastic Surgery Device Classification Panel), recommended that Proplast be classified under "Class II," which permits a device to be marketed under "general controls" applicable to all devices unless and until the FDA establishes performance standards expressly for that device, *see id.* at 2853; *see also* 21 U.S.C. §§ 360c(a)(1)(B), 360d. The FDA accepted these recommendations for the purposes of its proposed rulemaking, noting in 1982 that the latter two panels believed that "the safety and effectiveness of the material has been established through long-term clinical trials," 47 Fed. Reg. at 2818.

After summarizing the presentations made to the panels, *see id.,* many of which focused expressly on Proplast, *see id.* at 2846–47 (*e.g.,* Reference 41: Freeman, "Proplast[ ]. A Porous Implant for Contour Restoration," *British Journal of Plastic Surgery* (1976)), the FDA noted that it agreed with the panel recommendations after "consider[ing] the following information":

(1) The components of the device implant material, polytetrafluoroethylene and carbon fibers, are generally accepted as safe materials for human implantation. (2) [T]he material is designed to allow tissue ingrowth into the implant. (3) The material has been studied extensively in animals. (4) The material has been accepted as safe and effective by the Ear, Nose, and Throat Device Classification Panel [Refs. *16, 41,* and *42* ] for uses appropriate to the medical specialty areas covered by that Panel. (5) The material has been reviewed extensively in the clinical literature and there

have been substantive followup clinical trials of the material extending to 6 years. (6) No evidence has been found that the material is toxic. (7) No substantive clinical malfunction of the device material has occurred in maxillofacial reconstructive surgery, and it has been used successfully in 97 percent of 394 cases [Ref. *40*]. The agency believes that the clinical evidence of the material's safety, as ·well as the reported absence of toxicological problems in a 2–year dog study [Ref. *30*], support classification into class II.

47 Fed.Reg. at 2819 (bracketed references and italics in original).

While the classification process was proceeding, Vitek's work continued. After receiving favorable reports from experiments performed at Louisiana State University and performing research of its own, Vitek designed and manufactured the type of Proplast TMJ implant that is at issue in the present case. In 1982, Vitek applied to the FDA pursuant to the MDA for approval to market the Proplast TMJ implant subject to only "general controls," on the ground that the device was "substantially equivalent" to a device marketed prior to the date of enactment of the MDA, *see* 21 U.S.C. § 360c(f)(1)(A) (allowing the FDA to place a new device into the same classification as a "substantially equivalent" device marketed prior to the MDA). The FDA, without approving of the device itself, agreed, and allowed the Proplast TMJ implant to be marketed subject to "general controls":

> We have reviewed your Section 510(k) [21 U.S.C. § 360(k) ] notification of intent to market the ["Proplast TMJ Interpositional Implant"] device and we have determined the device to be substantially equivalent to one marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments of 1976. You may, therefore, market your device subject to the general controls provision of the [MDA] until such time as your device has been classified under Section 513 [21 U.S.C. § 360c]. At that time, if your device is classified into either class II (Standards) or class III

(Premarket Approval), it would be subject to additional controls.

(FDA 1983 letter to Vitek dated March 23, 1983 ("FDA 1983 Letter to Vitek").) The Proplast TMJ implant was not in fact classified prior to 1987, and standards specifically for that device were not adopted prior to plaintiffs' receipt of their implants.

In 1984, Du Pont employee Michael Bernhardt attended a conference of oral surgeons in connection with a market research project and prepared a memorandum summarizing reports of various speakers (the "Bernhardt Memorandum"). The memorandum noted that one speaker, reflecting on his 10 years of experience in TMJ repair, "concluded his talk with a plea for better biomaterials. The 'Proplast', 'Silastic' and metal prostheses they are using today simply do not do the job." (Bernhardt Memorandum at 3.) A doctor reporting on surgical failures was noted as having said that the biggest problem with Proplast was that it was very difficult to remove due to its tendency to fracture into many pieces into which natural tissue grows. Another was noted as having said that potential problems with "Proplast—used as meniscus augmentation since 1974," included "perforation or disintegration—deteriorates rapidly," "potential infection site (this is why filled with antibiotics)," and "mechanical failure—material may become folded with function of condyle." (*Id.* at 6.) This speaker indicated that Proplast was good in terms of stabilization and decreased migration, low friction, and high wettability. The Bernhardt Memorandum also described a presentation by Homsy as concluding that " 'Proplast', with appropriate porosity which accommodates substantial tissue ingrowth and softness matching that of ingrowing tissue, is a good candidate for long-term success." (*Id.*) The memorandum described another doctor's report of a study of 173 cases using Proplast as disc replacement, with at least 18 months' follow-up. "Ninety-three percent of patients reported at least some degree of improvement. Advantages of 'Proplast' include: inert, promotes tissue ingrowth, is easily shaped, easily compressible, low friction due to Teflon surface." (*Id.* at 3.) That speaker noted no disadvantages. Although the Bernhardt Memorandum reflected these

comments on Proplast and on various surgical devices and procedures, it did not report any mention of Vitek's Proplast TMJ implant in particular.

Notwithstanding the belief of Vitek that the Proplast TMJ implant was not medically hazardous, and the belief of the FDA that Proplast was a safe material for human implantation, many of the Proplast TMJ implants marketed by Vitek apparently began to deteriorate and to create medical problems for persons who had received them. The numerous lawsuits against Vitek led to its filing for protection under the bankruptcy laws; that filing was followed by the prosecution of numerous suits, including this one, against Du Pont.

B. *The District Court's Granting of Summary Judgment*

In an Amended Ruling on Defendant's Motion for Summary Judgment dated December 7, 1993, published at 834 F.Supp. 576, the district court concluded that although Du Pont's federal preemption argument should be rejected, Du Pont was entitled to summary judgment on the grounds that plaintiffs had presented insufficient evidence in support of the elements of their claims.

In rejecting Du Pont's contention that the CPLA had been preempted, the court noted Du Pont's reliance on the MDA's provision that

> no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> > (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> >
> > (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). After reviewing the pertinent Supreme Court authorities on preemption, and looking to regulations promulgated by the FDA as the agency charged with administering the MDA, *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), the court noted that the FDA itself interpret[ed] the preemptive scope of [§ 360k] to provide that

> . State or local requirements are preempted only when the Food and Drug Administration has established *specific counterpart regulations or there are other specific requirements applicable to a particular device* under the act, thereby making any existing divergent State or [l]ocal requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

834 F.Supp. at 582–83 (quoting 21 C.F.R. 808.1(d) (1992) (emphasis in district court's opinion)). The court continued:

> In other words, FDA regulations provide that "preemption does not apply when the FDA has issued no regulations or other requirements specific to the particular device." *King* [*v. Collagen Corp.,* 983 F.2d 1130, 1134 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993) ].... *Accordingly, a plaintiff's state law tort claim is preempted only if* (1) *the FDA has established regulations specific to the medical device at issue in the particular case;* (2) the state law claim constitutes a requirement different from, or in addition to, any requirement the FDA has made applicable to the device at issue; and (3) the claim relates to either the safety or effectiveness of the device or to any other matter included in a requirement made applicable to the device by the MDA.

834 F.Supp. at 583 (emphasis added).

The court noted that in 1983 the FDA had given Vitek temporary permission to " 'market [the Proplast TMJ implant] device subject to the *general controls* provisions of the [MDA] until such time as your device has been classified under Section 513....' " 834 F.Supp. at 584 (quoting FDA 1983 Letter to Vitek (emphasis in district court opinion; brackets ours)). In light of the fact that prior to the time of plaintiffs' implants the FDA had subjected the Proplast TMJ im-

plant only to "general controls" and had not issued regulations specific to that device, the court concluded that during the period in which plaintiffs received their implants the CPLA was not preempted by the MDA.

The court concluded, however, that Du Pont could not be liable to plaintiffs for other reasons. First, the court found that

the evidence in the record fails to raise a genuine issue of fact as to whether Du Pont should reasonably have anticipated that Vitek would incorporate Teflon into Proplast for use in the Proplast TMJ Implant itself. Although Du Pont may have been aware that its Teflon was being incorporated into the material Proplast, the plaintiffs have not suggested, much less shown, that Proplast is in any way inherently dangerous.... There is no indication that Du Pont either knew or should have known that Vitek would substantially alter Du Pont's Teflon by turning it into Proplast and then using the Proplast in the Proplast TMJ Implant, rendering the otherwise safe Teflon dangerous.

834 F.Supp. at 590.

The court went on to hold that even assuming that Du Pont knew its Teflon would be incorporated into the Proplast TMJ implant, Du Pont could not be liable on theories of negligence or failure to warn because plaintiffs had failed to present sufficient evidence that Du Pont either knew or reasonably should have known of the dangers in the use of the Proplast TMJ implant. The court noted that much of the research of which Du Pont was aware antedated Vitek's development of the Proplast TMJ implant by nearly 20 years and that the studies (a) had addressed the use of pure Teflon, not Proplast, (b) had not addressed use for jaws, and (c) had been described to Du Pont by Homsy as "crucially incomplete." The court concluded that

Du Pont owed no duty of care to the plaintiffs: the defendant neither knew, nor in the circumstances should have known, that the Proplast TMJ Implant was dangerous to recipients. Even assuming *arguendo* that Du Pont should have known that Vitek would use Du Pont's Teflon to make Proplast for use in the Proplast TMJ

Implant, the record reveals that Du Pont had little knowledge regarding the safety of using Teflon in medical applications generally and in the Proplast TMJ Implant in particular, and that the bulk of the knowledge it did have was far from current when the plaintiffs received their implants in 1985 and 1986.

*Id.* at 592.

The court noted that plaintiffs relied heavily on the Bernhardt Memorandum as proof that Du Pont was or should have been aware in 1984 that the Proplast TMJ implant was hazardous. The court pointed out, however, that the Bernhardt Memorandum contained no indication of any mention of the Proplast TMJ implant marketed by Vitek, and the court stated that, in any event, what Bernhardt had learned was largely favorable to the use of Proplast:

It thus would have been unreasonable for Du Pont to have drawn the conclusion that Proplast was dangerous from those evaluative comments that were made. Moreover, in assessing what Du Pont might have learned regarding the Proplast TMJ Implant from Bernhardt's attendance at the conference, it is significant to note that none of the speakers appears to have addressed or even mentioned that specific medical device.

*Id.* at 593. The court concluded as follows:

In sum, the evidence produced by the plaintiffs in the Bernhardt Memorandum, whether standing alone or taken together with the two early studies discussed above, cannot reasonably be said to support the conclusion that Du Pont knew or should have known of the dangers associated with Vitek's use of Du Pont Teflon in the Proplast TMJ Implant. This conclusion is particularly compelling in light of the fact that ... the FDA had approved the use of the Proplast material in medical and surgical applications. Du Pont simply had no reason to doubt the FDA's judgment regarding the material's safety and efficacy. What little negative information the defendant had about the safety of Proplast—a product manufactured by another company, Vitek—was, in some cases, quite old, and, in all cases, balanced by positive infor-

mation. Moreover, none of the information was generated internally by Du Pont. In such circumstances, to expect Du Pont to conclude that Proplast was dangerous on the basis of limited, dated knowledge that it had required second-hand, or even third-hand, would be unreasonable.

*Id.* at 593–94.

As to plaintiffs' claims of breach of warranty of merchantability or fitness for a specific use, the district court noted that under the Uniform Commercial Code, as adopted in Connecticut, such warranties

> are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty.

Conn.Gen.Stat.Ann. § 42a–2–316(3) (West 1990). In light of the indisputable record that Du Pont had repeatedly disclaimed to Vitek any warranty of Teflon for medical purposes, and the lack of any belief on the part of Vitek that Du Pont ever warranted Teflon for those purposes, the court concluded that plaintiffs could not succeed on their breach-of-warranty theory.

Having concluded as a matter of law that Du Pont "owed the plaintiffs no duty on any of the plaintiffs' theories of liability in the circumstances presented," 834 F.Supp. at 591, the court dismissed the complaint.

## II. DISCUSSION

On appeal, plaintiffs challenge only the rejection of their negligence and failure-to-warn theories of liability, not of their warranty theories. They contend principally (a) that the district court erred in granting summary judgment because there were genuine issues to be tried as to Du Pont's knowledge of Vitek's planned use of Teflon and as to the dangers of the use of Teflon in human joints, and (b) that the court erred in viewing Du Pont's duty to warn under the CPLA as a question of law. Du Pont urges that we affirm on the ground that the MDA preempted the CPLA or, alternatively, that as a matter of law Du Pont owed no duty to users of the Vitek Proplast TMJ implant.

We reject Du Pont's federal preemption contention substantially for the reasons stated by the district court in its opinion. We reject plaintiffs' contentions for the reasons that follow.

### A. *CPLA Incorporation of Common–Law Substantive Requirements*

■ The CPLA consolidates for most procedural purposes "all claims or actions brought for personal injury ... caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product." Conn. Gen.Stat.Ann. § 52–572m(b). Claims under the CPLA "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." *Id.* § 52–572n(a). With the consolidation of all product liability claims into a single form of action, the CPLA became the "exclusive remedy for claims falling within its scope." *Winslow v. Lewis–Shepard, Inc.*, 212 Conn. 462, 471, 562 A.2d 517, 521 (1989). Thus, a plaintiff may not assert a cause of action against the seller of a product for harm caused by the product except within the framework of the CPLA. *See, e.g., Daily v. New Britain Machine Co.*, 200 Conn. 562, 571–72, 512 A.2d 893, 899 (1986).

■ Although the CPLA introduced simplified pleading, *see, e.g., Winslow v. Lewis–Shepard, Inc.*, 212 Conn. at 470–71, 562 A.2d at 520–21, and created uniform rules for the various types of actions it encompasses, *see, e.g.*, Conn.Gen.Stat.Ann. § 52–577a (single statute of limitations applicable to all claims under CPLA); *id.* at § 52–572o(a) (allocation of damages on a comparative responsibility basis in all CPLA actions), it apparently was not meant to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail. *See, e.g., Winslow v. Lewis–Shepard, Inc.*, 212 Conn. at 470–71, 562 A.2d at 520–21 (" 'I wouldn't say we would be abolishing all case law, what we're really abolishing is the various causes of action that have been brought in cases which we normally would call products liability cases. For example, the theory of strict

liability, warranty, negligence and contract . . . would all be now merged into one cause of action which has been created by statute.'" (quoting statement by Senator Salvatore C. DePiano in support of the then-proposed CPLA)). In *Lynn v. Haybuster Manufacturing, Inc.*, 226 Conn. 282, 292, 627 A.2d 1288, 1293 (1993), the Connecticut Supreme Court stated that the intent of the legislature in enacting the CPLA, was "to eliminate the complex pleading provided at common law: breach of warranty, strict liability and negligence," rather than to "creat[e] a wholly new right," *id.* at 292, 627 A.2d at 1293, or to eliminate common-law substantive rights, *id.* at 288–89, 627 A.2d at 1291 (concluding that, notwithstanding the CPLA's silence on the subject, a "claim" within the meaning of the CPLA includes a spouse's loss-of-consortium claim which was, at common law, derivative of a negligence claim on behalf of the other spouse).

■ Since the CPLA was not meant to eliminate common-law substantive rights but does not itself spell out the elements of the types of claims it consolidates, we conclude that the district court was correct to assess plaintiffs' theories of recovery in light of the Connecticut common-law requirements.

B. *The Negligence Theory*

■ In order to prevail on a negligence theory under Connecticut law, a plaintiff must show, *inter alia,* that the defendant had a duty of care to the plaintiff. *See, e.g., Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620, 623–24 (1982). The question of whether a defendant owed the plaintiff a duty of care is generally a question of law, though the answer in a given case depends in part on the factual circumstances. For example, what the relationship was between plaintiff and defendant is an issue of fact for the factfinder; whether or not the relationship is of a type that imposes on the defendant a duty toward the plaintiff is a question of law for the court. *See, e.g., Gordon v. Bridgeport Housing Authority,* 208 Conn. 161, 171, 544 A.2d 1185, 1191 (1988); *Nolan v. The New York, New Haven & Hartford Railroad Co.,* 53 Conn. 461, 471–72, 4 Atl. 106, 108–09 (1885); *cf. Ying Jing Gan v. City of New York,* 996 F.2d 522, 534 (2d Cir.1993).

■ A plaintiff who brings a personal injury suit against the seller of a product alleged to have caused her harm must establish that a reasonably prudent person in the defendant's position, "knowing what [the defendant] knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Coburn v. Lenox Homes, Inc.,* 186 Conn. at 375, 441 A.2d at 624; *see also Restatement (Second) of Torts* § 388 (1965) ("*Restatement*") (supplier of chattel may be liable for physical harm caused by the use of the chattel if it "knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied"); *id.* comment *g* (supplier's duty "is to exercise reasonable care to give to those who are to use the chattel *the information which the supplier possesses,* and which he should realize to be necessary to make its use safe" (emphasis added)). If a plaintiff fails to present legally sufficient proof "of either actual or constructive notice of the defective condition," the defendant is entitled to judgment as a matter of law. *Phenning v. Silansky,* 144 Conn. 223, 226, 129 A.2d 224, 225 (1957).

■ When the defendant has sold an item that is only a component of the product that allegedly caused the plaintiff's injury, circumstances may well indicate that the seller had no knowledge or ability to know the hazards posed by the finished product. *See, e.g., Crossfield v. Quality Control Equipment Co.,* 1 F.3d 701, 704–05 (8th Cir.1993) (under Missouri law, supplier of a chain that is not inherently dangerous is not liable for injury caused by machine into which chain is integrated); *Childress v. Gresen Manufacturing Co.,* 888 F.2d 45, 49 (6th Cir.1989); *id.* at 46 ("component part manufacturer does not have a duty under Michigan law to analyze the safety of a completed product that incorporates its nondefective component part"); *Jacobini v. V. & O. Press Co.,* 527 Pa. 32, 39, 588 A.2d 476, 479 (1991) (stating obiter that duty of manufacturer is limited when it supplies component of a final product assembled by another person, and the dangers are asso-

ciated with the use of the finished product). As both the *Crossfield* and *Childress* courts stated, " '[t]he obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not—at least yet—extend to anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.' " *Crossfield v. Quality Control Equipment Co.,* 1 F.3d at 706 (quoting *Jordan v. Whiting Corp.,* 49 Mich.App. 481, 486, 212 N.W.2d 324, 328 (1973), *rev'd on other grounds,* 396 Mich. 145, 240 N.W.2d 468 (1976)); *Childress v. Gresen Manufacturing Co.,* 888 F.2d at 49 (same).

■ The fact that a component seller may be aware that its component will be used in a downstream product does not mean that it is aware of the hazards of the final product, especially where the component is one that has many uses. *See, e.g., Jacobini v. V. & O. Press Co.,* 527 Pa. at 40, 588 A.2d at 480 (component seller "cannot be expected to foresee every possible risk that might be associated with use of [a] completed product" manufactured by another). As the *Childress* court observed,

> there is a marked difference between knowing the identity of the equipment into which a component part will be integrated and anticipating any hazardous operation by that equipment that might be facilitated by the addition of the component part. Indeed, extending the duty to make a product safe to the manufacturer of a non-defective component part would be tantamount to charging a component part manufacturer with knowledge that is superior to that of the completed product manufacturer.

*Childress v. Gresen Manufacturing Co.,* 888 F.2d at 49. *See also Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 118 (3d Cir.1992) (noting Pennsylvania-law distinction between supplier whose product has but one use and supplier whose product has numerous productive uses), *cert. denied,* —— U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993); *Restatement* § 402A, comment *p* (seller of a compo-

nent that is "capable of a wide variety of uses" is not as likely to be held liable for hazards inherent in final product as would be the seller of a single-use component); *Kalinowski v. E.I. Du Pont de Nemours & Co.,* 851 F.Supp. 149, 156–59 (E.D.Pa.1994) (under Pennsylvania law, no obligation on Du Pont to keep abreast of developments with respect to biomedical uses of Teflon and no duty to warn of hazards of which Du Pont was not aware).

Though the cases just discussed applied the laws of other jurisdictions, they are jurisdictions to whose laws the courts of Connecticut have looked, from time to time, for other negligence principles. *See, e.g., Sharp v. Wyatt Inc.,* 31 Conn.App. 824, 845 n. 16, 627 A.2d 1347, 1358 n. 16 (1993) (citing 8th Circuit case that applied Missouri law), *aff'd,* 230 Conn. 12, 644 A.2d 871 (1994); *Phenning v. Silansky,* 144 Conn. at 227, 129 A.2d at 226 (citing Pennsylvania law); *Furstein v. Hill,* 218 Conn. 610, 616–18, 590 A.2d 939, 943–44 (1991) (citing Michigan law); *Garthwait v. Burgio,* 153 Conn. 284, 289–90, 216 A.2d 189, 192 (1965) (adopting *Restatement* § 402A).

■ The district court properly applied these principles to the present case. Plaintiffs presented no evidence that there was anything inherently defective about Du Pont's Teflon before it was used by Vitek in making the Proplast TMJ implant, and they presented insufficient evidence to permit a reasonable factfinder to infer that Du Pont knew or should have known of the hazards of the Vitek Proplast TMJ implant. Plaintiffs' evidence as to Du Pont's actual information about the implant's possible dangers consisted of (a) studies published in the 1960s suggesting that pure Teflon was dangerous when used in hip joints, and (b) the 1984 Bernhardt Memorandum. As the district court noted, however, the 1960s studies long predated plaintiffs' 1985–1986 receipt of their implants. Those studies on hip replacements using pure Teflon were contemporaneously characterized by Homsy as not relevant to jaw implants made of a different material; and both contemporaneously and in the intervening years, other research suggested that the early Teflon hip joint studies were inapposite to jaw implants. Indeed, there is no

dispute that in 1982, FDA expert panels were persuaded that "the safety and effectiveness of [Proplast] ha[d] been established through long-term clinical trials," 47 Fed.Reg. 2818; that the FDA agreed that "[t]he components of the device implant material, polytetrafluoroethylene and carbon fibers, are generally accepted as safe materials for human implantation," *id.* at 2819; and that in 1983, the FDA granted permission for Vitek to market the Proplast TMJ implant.

The 1984 Bernhardt Memorandum, substantially for the reasons stated by the district court, was insufficient to permit the inference that Du Pont knew or should have known of the dangers in Vitek's Proplast TMJ implant. That memorandum did not reflect any statement by a conference participant that Vitek's Proplast TMJ implant was dangerous; indeed, the memorandum did not indicate that any speaker even mentioned that device. Though Homsy spoke, his topic was "Tissue Response on Metals and Polymers," and the Bernhardt Memorandum reflects his mention of Vitek only with respect to its development of a procedure for testing biocompatibility *in vitro;* there is no indication in the memorandum that Homsy mentioned the Vitek TMJ implant. Further, although Proplast was one of the materials discussed, the memorandum's reported references by other speakers to lengthy trial periods, *e.g.,* 173 cases with 18 months' follow-up, and 10 years' experiences with meniscus augmentation materials, show that those speakers were not in fact discussing the Vitek TMJ implant, for the FDA had given that device marketing approval just months before the conference. Finally, as the district court observed, most of the reports by those who had had years of experience with Proplast were largely favorable. We reject plaintiffs' contention that the Bernhardt Memorandum was sufficient to create an inference that Du Pont knew the hazards of the Vitek Proplast TMJ implant.

In sum, the record leaves no room for doubt that Du Pont did not recommend Teflon for medical implantation uses, that it lacked the expertise to evaluate developments in those uses, and that those developments satisfied the FDA and its expert pan-

els that Proplast was safe for use in human implantation. We do not believe the Connecticut courts would conclude, in the circumstances, that Du Pont had a duty either to become expert in, or to monitor the developments in, such uses. In light of all the developments, we agree with the district court that the Bernhardt Memorandum and the early studies of which Du Pont was aware were insufficient to permit a reasonable factfinder to infer that in 1985 or 1986 Du Pont knew or reasonably should have known of the hazards attendant upon use of Vitek's Proplast TMJ implant.

Accordingly, plaintiffs'· negligence theory was properly rejected as a matter of law because plaintiffs failed to establish that Du Pont owed them a duty of care with respect to those implants.

## C. *The Failure–To–Warn Theory*

In addition to incorporating principles of common-law negligence, the CPLA includes a section that deals with a product seller's liability for failure to warn. It provides as follows:

(a) A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided.

(b) In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions.

(c) In claims based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm.

(d) A product seller may not be considered to have provided adequate warnings

or instructions unless they were devised to communicate with the person best able to take or recommend precautions against the potential harm.

Conn.Gen.Stat.Ann. § 52–572q. Plaintiffs contend that the reference in subsection (b) to determinations of the need for and adequacy of warnings as being made by "the trier of fact" means that a court cannot properly reject a failure-to-warn theory as a matter of law. We disagree.

■ Under § 52–572q, it is established that "[a] product is defective when it is unreasonably dangerous to the consumer or user," *Sharp v. Wyatt Inc.*, 31 Conn.App. at 833, 627 A.2d at 1352, and that a product may be defective if it is not accompanied by adequate warnings:

> [a] product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities.... Under such circumstances, the failure to warn, *by itself,* constitutes a defect.

*Id.,* 627 A.2d at 1353 (emphasis and brackets in original, internal quotes omitted). This is consistent with Connecticut common law. For example, with respect to events that occurred prior to the 1979 adoption of the CPLA, the Connecticut Supreme Court noted that

> [i]t is well established in this jurisdiction ...[,] *Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir.1969)[,] as well as in a majority of other jurisdictions[,] ... that "[a] product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities." See Restatement (Second), Torts § 402A....
>
> Dean Prosser, the Restatement (Second) Reporter, states: "There is no dispute that the seller is under a duty to give adequate warning of unreasonable dangers involved in the use of which he knows, or should know...." Prosser, Law of Torts (4th Ed.1971), pp. 646–47. See *Basko v. Sterling Drug, Inc.,* [416 F.2d at] 426....

*Giglio v. Connecticut Light & Power Co.,* 180 Conn. 230, 235–36, 429 A.2d 486, 489 (1980).

■ As the second quoted paragraph of *Giglio* reflects, the seller's duty to warn encompasses only those dangers "of which he knows, or should know." *Id.* (internal quotes omitted); *see Tomer v. American Home Products Corp.,* 170 Conn. 681, 689–90, 368 A.2d 35, 39–40 (1976) (manufacturer has a duty to warn only of dangers of which it "knows or should know"). Thus, in *Basko v. Sterling Drug, Inc.,* cited approvingly in *Giglio* and *Tomer,* this Court observed that "there is no duty to warn of unknown or unforeseeable risks." 416 F.2d at 426.

■ Section 52–572q did not alter this principle. Though the section does not specifically describe the boundaries of the seller's duty, any more than the CPLA spells out the elements of any of the causes of action it was enacted to encompass, the fundamental principle that a seller's duty to warn is premised on the existence of its knowledge or its reason to know of the hazards is evident. For example, subsection (b) states that the trier of fact, in determining whether a warning was necessary, may consider "the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm." Conn. Gen.Stat.Ann. § 52–572q(b). The direction of focus to the seller's ability to anticipate the product user's awareness of the nature and extent of the risk plainly presupposes that the seller itself has an awareness of the nature and extent of that risk.

Nonetheless, plaintiffs argue that under the ruling in *Sharp v. Wyatt Inc.,* 31 Conn. App. at 834, 627 A.2d at 1353 ("*Sharp*"), all questions under § 52–572q(b) are to be decided by the trier of fact after trial and that the seller's duty cannot be determined by the court as a matter of law. We reject this interpretation. In *Sharp,* the state appellate court reversed the granting of summary judgment in favor of the defendants on a claim under § 52–572q for injuries and deaths allegedly caused by the defendants' failure to warn of certain characteristics of petroleum products, finding that the lower court had erroneously failed to recognize that a product may be dangerous simply because of the failure to warn. The *Sharp* court

found the trial court had erred in "requir[ing] a showing that the product itself was defective before addressing the question of whether it was defective *because* the defendants failed to provide adequate warnings." 31 Conn.App. at 834, 627 A.2d at 1353 (emphasis added). However, the question of whether a product was dangerous because of the absence of warnings is not the same question as whether the seller had the duty to issue warnings. As discussed above, it is established that there is no such duty if the seller does not know and has no reason to know of the hazards. That proposition is indeed instinct in many of the *Sharp* court's observations as to the scope and thrust of § 52–572q. For example, the court noted that § 52–572q may require the manufacturer to condition resale on "a particular set of warnings to subsequent purchasers." 31 Conn.App. at 850, 627 A.2d at 1360. There can be no "particular" set of warnings unless the manufacturer knows of the hazards.

Further, *Sharp* did not suggest that subsection (b)'s listing of factors that may be considered by the finder of fact relieves the court of the obligation to determine whether there is sufficient evidence of all material fact propositions to submit the failure-to-warn claim to a jury. Though the *Sharp* court found that the lower court in that case had "improperly applied § 52–572q in granting summary judgment for the defendants," 31 Conn.App. at 834, 627 A.2d at 1353, the *Sharp* opinion did not suggest that summary judgment could never be granted against a claimant under that section. For example, though the court noted that "[q]uestions regarding the existence of a causal link classically are reserved for determination by the trier of fact," *id.* at 835, 627 A.2d at 1353, it pointed out that "if the defendants were to put forth undisputed evidence that the users were fully aware of the dangers of deoxygenation and disregarded this knowledge, the lack of cause would in fact support the granting of summary judgment." *Id.* at 850 n. 18, 627 A.2d at 1361 n. 18; *see also Haesche v. Kissner,* 229 Conn. 213, 221–22, 640 A.2d 89, 93 (1994) (upholding grant of summary judgment on plaintiff's product liability claims on the ground that a reasonable trier of fact could not have concluded that the defendant's

failure to warn had caused the plaintiff's injury). Far from indicating that § 52–572q(b) permits no determinations to be made by the court as a matter of law, the *Sharp* court confirmed the general principle that summary judgment on a § 52–572q claim would be appropriate "when the mind of a fair and reasonable person could reach only one conclusion." *Sharp,* 31 Conn.App. at 835, 627 A.2d at 1354 (internal quotes omitted); *Hall v. Winfrey,* 27 Conn.App. 154, 158, 604 A.2d 1334, 1337 (internal quotes omitted), *certification denied,* 222 Conn. 903, 606 A.2d 1327 (1992).

In sum, nothing in *Sharp* or in § 52–572q suggests that a manufacturer of a nondangerous component who does not know and has no reason to know the hazards of the end product that incorporates its component has a duty to warn the ultimate user as to those hazards. Where there is insufficient evidence to permit a reasonable trier of fact to infer that the seller of a device had or had reason to have such knowledge, nothing in *Sharp* or in § 52–572q suggests that that section precludes the entry of judgment in the seller's favor as a matter of law.

For the reasons discussed in Part II.B. above, the evidence presented by plaintiffs here was insufficient to permit a reasonable inference that Du Pont knew or reasonably should have known that the Vitek Proplast TMJ implant was hazardous. Accordingly, the district court correctly determined as a matter of law that plaintiffs could not establish that Du Pont had a duty to warn under § 52–572q.

## CONCLUSION

We have considered all of plaintiffs' arguments on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.