Kathleen **DENSBERGER, Individually and as Executrix of the Estate of Colonel William Densberger, et al., Plaintiffs,**

v.

**UNITED TECHNOLOGIES CORPORATION, Defendant.**

**No. Civ.A. 3:96CV532JCH.**

United States District Court, D. Connecticut.

Oct. 24, 2000.

Francis G. Fleming, Brian J. Alexander, Kreindler & Kreindler, New York, NY, William R. Davis, Andrew S. Groher, Riscassi & Davis, P.C., Hartford, CT, Thomas J. Harlan, Jr., Harlan & Flora, Norfolk, VA, Robert F. Spohrer, Floyd L. Matthews, Sean B. Cronin, Spohrer, Wilner, Maxwell & Matthews, Jacksonville, FL, Donald Maciejewski, Zisser, Robison, Brown, Nowlis, & Maciejewski, Jacksonville, FL, for Kathleen Densberger, Eric Johnson.

William R. Davis, Andrew S. Groher, Riscassi & Davis, P.C., Hartford, CT, Thomas J. Harlan, Jr., Harlan & Flora, Norfolk, VA, Robert F. Spohrer, Floyd L. Matthews, Sean B. Cronin, Spohrer, Wilner, Maxwell & Matthews, Jacksonville, FL, Donald Maciejewski, Zisser, Robison, Brown, Nowlis, & Maciejewski, Jacksonville, FL, for Mary Ann Kelly, Lisa Rhodes Truluck, Deborah L. Robertson, Christopher Mancini, Wendy Mancini.

Francis H. Morrison, III, Day, Berry & Howard, Hartford, CT, Raymond Mariani, Dombroff & Gilmore, New York City, Mark A. Dombroff, Drombroff & Gilmore, Washington, DC, for United Technologies Corp.

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL AND/OR ALTERATION OR AMENDMENT OF JUDGMENT [DKT. NO. 285]

HALL, District Judge.

This case involves the crash of a United States Army ESSS-equipped Blackhawk helicopter in Germany in 1993. The plaintiffs in this action are two men injured in the crash, including one of the helicopter's pilots, and the widows of four other men who died in the crash. The defendant is United Technologies Corporation ("UTC"), which manufactured the airframe and some component parts in its Sikorsky helicopter division of the product at issue: the Blackhawk helicopter bearing serial num-

ber 88–26059 sold and delivered to the Army by UTC, which helicopter was factory-equipped with hard points capable of accepting an ESSS kit, and an ESSS kit, which was also sold and delivered to the Army by UTC (without ESSS fuel tanks).[1]

The case involves a dispute over whether UTC manufactured a defective helicopter, and, if so, whether UTC should be held liable for the crash. The plaintiffs alleged that the aircraft was defective and negligently designed and manufactured in that it was dangerously unstable and not crashworthy. Specifically, the plaintiffs brought a cause of action under the Connecticut Product Liability Act' ("CPLA") on the basis of three theories of liability: strict liability in tort, negligence, and breach of implied warranty of merchantability. Under each of these three theories of liability, the plaintiffs proceeded on three factual allegations: 1) UTC failed to calculate a proper lateral center of gravity envelope for the ESSS-equipped Blackhawk helicopter sold and delivered to the Army by UTC; 2) UTC failed to warn the Army that this helicopter could become uncontrollable during foreseeable flight conditions; and 3) the helicopter that UTC manufactured and sold to the Army was not sufficiently crashworthy.

UTC denied the plaintiffs' allegations. UTC also raised four special defenses: the government contractor defense, superseding cause, alteration/modification, and comparative negligence.

Following trial, the jury returned a verdict for the plaintiffs on their cause of action under the CPLA on a negligence theory of liability based on the plaintiffs' factual allegation that "UTC failed to warn the Army that [the Blackhawk helicopter bearing serial number 88–26059 sold and delivered to the Army by UTC, which helicopter was factory-equipped with hard points capable of accepting an ESSS kit, and an ESSS kit, which was also sold and delivered to the Army by UTC (without

fuel tanks) ], could become uncontrollable during foreseeable flight conditions." Special Verdict Form (Dkt. No. 279) at ¶ 2(b). The jury found against UTC on its four special defenses. *Id.* at ¶¶ 5, 7–8, 10.

At the close of the plaintiffs' case-in-chief, UTC moved pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on the grounds of superseding causation or plaintiffs' failure to prove causation, and plaintiffs' lack of proof to support an award of punitive damages. Trial Tr. (Dkt. No. 257) at 1515. The court reserved on the motion. *Id.* at 1524. UTC then renewed its motion for judgment as a matter of law at the close of the evidence. Tr. of Motion Hearing on June 2, 2000 at 2. UTC now renews its motion for judgment as a matter of law, or motion for j.n.o.v., pursuant to Fed. R.Civ.P. 50(b)(1)(C) and seeks, in the alternative, a remittitur of certain damage awards or a new trial under Fed.R.Civ.P. 59(a) and 59(e). *See* UTC's Motion for Judgment as a Matter of Law, New Trial, or Alteration or Amendment of Judgment (Dkt. No. 285). For the following reasons, the court denies UTC's motion.

## I. Defendant's Motion for Judgment as a Matter of Law

### A. Standard

■■■ Rule 50(b) of the Federal Rules of Civil Procedure allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis. The standard under Rule 50 is the same as that for summary judgment: A court may not grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir.1998) (citation

---

1. This helicopter was equipped to carry two 230–pound tanks on each side of the helicopter, to provide substantially more fuel capacity for long-range travel and self-deployment.

and internal quotation marks omitted). Thus, in deciding such a motion, "the court must give deference to all credibility determinations and reasonable inferences of the jury ... and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (citations omitted). In short, the court cannot "substitute its judgment for that of the jury." *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995) (citations omitted). Rather, judgment as a matter of law may only be granted if:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

*Galdieri–Ambrosini*, 136 F.3d at 289 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir.1994)) (internal quotation marks omitted).

Moreover, "weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.'" *This Is Me, Inc.*, 157 F.3d at 142 (quoting *Piesco v. Koch*, 12 F.3d 332, 341, 343 (2d Cir.1993)). The court "must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor." *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) (citation omitted). Thus, "[a] party

seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden." *Id.*

Furthermore, Rule 50(b) provides:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59.

Procedurally, then, "'[a] motion for j.n.o.v. is technically a renewal of a motion for a directed verdict.' ... Thus, Federal Rule of Civil Procedure 50(b) generally proscribes judgment n.o.v. on any ground not specifically raised in an earlier motion for a directed verdict at the close of all the evidence." *Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir.1996) (citations omitted).

In this case, UTC moved for judgment as a matter of law on two grounds at the close of the plaintiffs' case and again at the close of the evidence: superseding causation or plaintiffs' failure to prove causation, and the lack of proof to support punitive damages.[2] *See* Tr. of Motion Hearing on June 2, 2000 at 2; Trial Tr. (Dkt. No. 257) at 1515. The law of the Second Circuit is clear that, "if an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is 'required to prevent manifest injustice.'" *Cruz*, 34 F.3d at 1155 (citation omitted). The Second Circuit has further articulated the contours of the relationship between issues raised in motions for judgment as a matter of law at trial and post-trial:

---

**2.** The jury did not reach the issue of punitive damages because it answered "No" to the question: "Have the plaintiffs proven by a preponderance of the evidence that the harm

suffered by them was the result of UTC's reckless disregard for the safety of product users?" Special Verdict Form (Dkt. No. 279) at ¶ 27.

Under Rule 50(a), a party may move for judgment as a matter of law ("JMOL") during trial at any time prior to the submission of the case to the jury. Fed.R.Civ.P. 50(a)(2). The Rule requires the party making such a motion to "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." *Id.* After an unfavorable verdict, Rule 50(b) allows the party to "renew" its motion. "The posttrial motion is limited to those grounds that were 'specifically raised in the prior motion for [JMOL]' "; the movant is not permitted to add new grounds after trial....

Although Rule 50(a) "does not define how specific" the motion must be, ..., the purpose of requiring the moving party to articulate the ground on which JMOL is sought "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury," .... "The articulation is necessary ... so that the responding party may seek to correct any overlooked deficiencies in the proof." Fed.R.Civ.P. 50 Advisory Committee Note (1991). Accordingly, the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported.

*Galdieri–Ambrosini,* 136 F.3d at 286 (citations omitted). In order to prevail on the instant motion, therefore, UTC must prevail on grounds sufficiently related to causation or grounds raised with sufficient specificity in the colloquy following each of UTC's motions for judgment as a matter of law "to alert the opposing party to the supposed deficiencies in [their] proof." *Id.* at 287. Otherwise, UTC must prove that judgment as a matter of law is required on

other grounds to prevent "manifest injustice." [3] *Id.* (citing *Cruz,* 34 F.3d at 1155).

## B. The court reaffirms its prior rejection of the premises of UTC's primary argument in support of its motion for judgment as a matter of law.

UTC's argument in support of its motion for judgment as a matter of law primarily rests on three legal premises which the court previously considered and rejected before charging the jury in this case. Having reviewed UTC's motion and papers in support thereof and the record before the jury at trial, the court can find no reason to overturn its prior decisions on these issues.

■ First, the Connecticut Product Liability Act ("CPLA"), Conn.Gen.Stat. § 52–572m et seq., does not, as UTC has repeatedly claimed throughout this case, limit product liability actions to strict liability in tort. Rather, Conn.Gen.Stat. § 52–572n(a) provides that "[a] product liability claim as provided in sections 52–240a, 52–240b, 52–572m to 52–572q, inclusive, and 52–577a may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." Section 52–572m(b) provides that the definition of " '[p]roduct liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent." As the Second Circuit has observed:

---

**3.** The court notes that this more restrictive standard for a Fed.R.Civ.P. 50(b) motion raising new grounds was not briefed by the plaintiffs. However, the court will not deem the plaintiffs to have somehow consented to the application of the less restrictive standard of deciding a Rule 50(b) motion, because the requirement that the grounds for a post-verdict motion for judgment as a matter of law be raised in an earlier motion "may not be waived as a mere technicality." *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1155 (2d Cir.1994) (citation omitted).

[t]he CPLA consolidates for most procedural purposes "all claims or actions brought for personal injury ... caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product." Conn.Gen.Stat.Ann. § 52–572m(b).... With the consolidation of all product liability claims into a single form of action, the CPLA became the "exclusive remedy for claims falling within its scope." *Winslow v. Lewis–Shepard, Inc.*, 212 Conn. 462, 471, 562 A.2d 517, 521 (1989). Thus, a plaintiff may not assert a cause of action against the seller of a product for harm caused by the product except within the framework of the CPLA. *See, e.g., Daily v. New Britain Machine Co.*, 200 Conn. 562, 571–72, 512 A.2d 893, 899 (1986).

*LaMontagne v. E.I. Du Pont De Nemours & Co., Inc.*, 41 F.3d 846, 855 (2d Cir.1994). However, the Second Circuit found, after reviewing Connecticut state court cases construing the CPLA, that, "[a]lthough the CPLA introduced simplified pleading, ..., and created uniform rules for the various types of actions it encompasses, ..., it apparently was not meant to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail." *Id.* (citations omitted). The Court of Appeal noted that, "[i]n *Lynn v. Haybuster Manufacturing, Inc.*, 226 Conn. 282, 292, 627 A.2d 1288, 1293 (1993), the Connecticut Supreme Court stated that the intent of the legislature in enacting the CPLA, was 'to eliminate the complex pleading provided at common law: breach of warranty, strict liability and negligence,' rather than to 'creat[e] a wholly new right,' ..., or to eliminate common-law substantive rights...." *Id.* at 856 (citations omitted); *see also Gajewski v. Pavelo*, 36 Conn. App. 601, 611 n. 11, 652 A.2d 509 (1994) ("Before the enactment of General Statutes § 52–572m et seq., complex pleading requirements required injured parties to plead their cases under the separate theories of breach of warranty, strict liability,

and negligence." (citing *Lynn*, 226 Conn. at 292, 627 A.2d 1288)), *aff'd*, 236 Conn. 27, 670 A.2d 318 (1996). Thus, the Second Circuit concluded that, "[s]ince the CPLA was not meant to eliminate common-law substantive rights but does not itself spell out the elements of the types of claims it consolidates, we conclude that the district court was correct to assess plaintiffs' theories of recovery in light of the Connecticut common-law requirements." *LaMontagne*, 41 F.3d at 856; *see also Lamontagne v. E.I. Du Pont de Nemours & Co., Inc.*, 834 F.Supp. 576, 587–89 (D.Conn. 1993) (Cabranes, J.), *aff'd*, 41 F.3d 846 (2d Cir.1994) (discussing at length preservation of common law theories of liability under the consolidated CPLA cause of action).

UTC claims that the Connecticut Supreme Court rejected *LaMontagne* in *Gajewski v. Pavelo*, 236 Conn. 27, 670 A.2d 318 (1996), *aff'g* 36 Conn.App. 601, 652 A.2d 509 (1994). A subsequent decision by the Connecticut Supreme Court, however, repudiates UTC's claim. In *Potter v. Chicago Pneumatic Tool Co.*, the Connecticut Supreme Court cited *LaMontagne* with approval for the very proposition that UTC seeks to deny: "because [the CPLA] does not delineate elements of claims that it consolidates, common law provides [the] basis for theories of recovery." 241 Conn. 199, 245, 694 A.2d 1319 (1997) (citing *LaMontagne*, 41 F.3d at 856).

■ As to UTC's second premise, the CPLA preserves theories of recovery based on negligence while eliminating separate common law negligence causes of action in product liability suits. *See Am. Nat'l Fire Ins. Co. v. A. Secondino & Sons*, 832 F.Supp. 40, 42 (D.Conn.1993). Contrary to UTC's repeated assertion, the CPLA does not abolish product liability on a negligence theory. Rather, as the Connecticut Supreme Court observed in *Potter*, "the legislature made it clear that, although the [CPLA] was intended to abolish various common-law causes of action

and to consolidate them into one statutory claim, it was not intended to abolish all common-law considerations." *Potter*, 241 Conn. at 245, 694 A.2d 1319 (citing, *inter alia, LaMontagne*, 41 F.3d at 855–56). As noted above, the plain language of the statute provides that a " '[p]roduct liability claim' include[s], but is not limited to, all actions based on the following theories: Strict liability in tort; negligence...." Conn.Gen.Stat. § 52–572m(b); *see also id.* § 52–572n(a) ("A product liability claim as provided in sections 52–240a, 52–240b, 52–572m to 52–572q, inclusive, and 52–577a may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."). Thus, "plaintiffs are permitted to allege negligence in a claim based on the CPLA," so long as the plaintiffs' claims do not include "a separate common law claim alleging conduct which is covered by the [CPLA]." *Secondino*, 832 F.Supp. at 42. In accordance with these precedents, the court properly charged the jury to consider the plaintiffs' three theories of liability for strict liability in tort, negligence, and breach of implied warranty of merchantability, under one cause of action sounding in product liability under the CPLA. *See* Jury Charge (Dkt. No. 270) at 22–40.

■ Third, despite UTC's argument to the contrary, the CPLA preserves liability for a negligent breach of a manufacturer's continuing, post-sale duty to warn of known or knowable dangers associated with using its product. As discussed above, common law theories of liability and defenses are preserved under the CPLA where the statute does not expressly eliminate them. *See LaMontagne*, 41 F.3d at 856; *Potter*, 241 Conn. at 245, 694 A.2d 1319. Connecticut common law provided for liability for negligent breach of a post-sale duty to warn. *See, e.g., Prokolkin v. Gen'l Motors Corp.*, 170 Conn. 289, 301, 365 A.2d 1180 (1976). Conn.Gen.Stat. § 52–572m(b) clearly incorporates within the CPLA, but does not eliminate, liability for a "breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent." The court recognizes that Conn.Gen.Stat. § 52–572q addresses failure to warn claims under the CPLA.[4] However, Conn.Gen.Stat. § 52–572q does not expressly indicate that the sole theory of liability for failure to warn under the CPLA arises only pre-sale or under strict liability in tort,[5] and neither the court nor the parties have identified any decisions holding to the contrary.[6] As such, section

---

4. Conn.Gen.Stat. § 52–572q provides:

 (a) A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided.
 (b) In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions.
 (c) In claims based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm.
 (d) A product seller may not be considered to have provided adequate warnings or instructions unless they were devised to communicate with the person best able to take or recommend precautions against the potential harm.

5. Conn.Gen.Stat. § 52–572q(b)(2), providing that, "[i]n determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: ... (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm," does not expressly preclude liability for breach of a post-sale duty to warn under the CPLA.

6. In fact, the court has located no cases directly on point, including *Gajewski v. Pavelo,*

52–572q does not expressly define every duty to warn for which a manufacturer may be held liable under the CPLA, and, "[i]n the absence of any specific provision in the CPLA addressing the defendant's duty under such a theory, however, the test for establishing that element of a plaintiff[s'] case must be governed by the common law of Connecticut as it existed prior to the passage of the CPLA and as modified since the enactment of that statute." *Lamontagne*, 834 F.Supp. at 588 (footnote omitted), *aff'd*, 41 F.3d 846 (2d Cir.1994).

Thus, the court charged the jury on the plaintiffs' factual allegation of a failure to warn under the strict liability, negligence, and breach of implied warranty theories of liability. *See* Jury Charge (Dkt. No. 270) at 22–40. However, because an element of strict liability required the jury to find that "the defect existed at the time of sale" and because an element of breach of implied warranty of merchantability required the jury to find that UTC sold goods "which were *not merchantable at the time of sale*," the court instructed the jury to consider UTC's liability for breach of a manufacturer's post-sale, "continuing duty to warn of all known or knowable dangers associated with using its product" under the plaintiffs' negligence theory of liability only. *See id.* at 23, 32, 34.

### C. UTC has failed to sustain its burden in support of a motion for judgment as a matter of law.

Separated from these rejected premises, UTC's motion for judgment as a matter of

law rests entirely on its claim that it has proven its compliance with any post-sale duty to warn and that it is entitled to judgment on the basis of its affirmative defenses as a matter of law. *See* Memo. of Law in Support of UTC's Motion for Judgment as a Matter of Law, New Trial, or Alteration or Amendment of Judgment (Dkt. No. 291) at 9–22. As noted above, a Rule 50(b) motion for judgment as a matter of law may be granted only if "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or if "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Galdieri–Ambrosini*, 136 F.3d at 289 (citation omitted). The court finds that UTC has failed to carry its "very heavy burden" to prove that either condition is present in this case. *Norton v. Sam's Club*, 145 F.3d at 118.

■ As to the plaintiffs' claim that UTC failed to fulfill its post-sale duty to warn, the jury had before it evidence of UTC's awareness of the use the Army was making of the ESSS-equipped Blackhawk helicopter. Moreover, the adequacy of the warning was a fact question for the jury to decide, and any warnings given were required to be devised to be understood by the Army. *See* Conn.Gen.Stat. § 52–572q(d); Jury Charge (Dkt. No. 270) at 27. The jury heard, and apparently rejected, the claims that UTC raises now regarding the Army's awareness of any potential

---

36 Conn.App. 601, 652 A.2d 509 (1994), *aff'd*, 236 Conn. 27, 670 A.2d 318 (1996), and *Sharp v. Wyatt*, 31 Conn.App. 824, 627 A.2d 1347, *aff'd*, 230 Conn. 12, 644 A.2d 871 (1994). Thus, it is also true that no Connecticut court decisions have expressly affirmed liability under the CPLA for negligent breach of a continuing duty to warn. UTC's citation to a passing reference in the Connecticut Supreme Court's per curiam decision in *Sharp v. Wyatt* does not establish that there is no liability for negligent breach of a continuing duty to warn under the CPLA. *See* Reply Memo. of Law in Further Support of UTC's Motion for Judg-

ment as a Matter of Law, New Trial, or Alteration or Amendment of Judgment (Dkt. No. 302) at 2 (quoting *Sharp*, 230 Conn. at 13, 644 A.2d 871 for the proposition that "Section 52–572q is '*the* warnings provision of Connecticut's product liability statute, General Statutes § 52–572q'" (emphasis in original)). The court notes that the discussion in the *Sharp* decisions focused upon a pre-sale duty to warn, not the post-sale failure to warn at issue in the instant case. *See, e.g., Sharp*, 31 Conn.App. at 850, 627 A.2d 1347, *aff'd*, 230 Conn. 12, 644 A.2d 871.

dangers associated with the use of the ESSS kit with the Blackhawk helicopter for purposes other than self-deployment and Hellfire missile demonstration. A reasonable jury could conclude from the evidence at trial that UTC and not the Army knew or should have known that the helicopter could become uncontrollable in an asymmetric condition when equipped with the ESSS kit. The court finds that UTC has failed to show, with regard to the plaintiffs' failure to warn allegations under their negligence theory of liability, that judgment as a matter of law is required to prevent a manifest injustice, either based on a complete absence of evidence supporting the verdict or such an overwhelming amount of evidence in favor of UTC that reasonable and fair minded persons could not arrive at a verdict against it.

With regard to UTC's special defenses, as the court instructed the jury, UTC had the burden of proof with regard to its government contractor defense and its alteration/modification defense.[7] *See* Jury Charge (Dkt. No. 270) at 41. UTC therefore must show that judgment as a matter of law is required to prevent a manifest injustice because the jury was presented with such an overwhelming amount of evidence in favor of UTC that reasonable and fair minded persons could not find in its favor on these defenses. This UTC has not done.

■■■ The court gave the jury the following charge on the government contractor defense with regard to the plaintiffs' allegations of a failure to warn:

Plaintiffs' second factual allegation concerns product warnings, that is, warnings concerning controllability during foreseeable flight conditions. With regard to the first element of the government contractor defense, approval of specifications that are "reasonably precise" regarding warnings means that the government exercised control over significant details concerning the warnings

UTC was required to and could provide about the "product."

Regarding the second element, that the "product" conformed to the specifications, with regard to plaintiffs' design defect allegations, UTC must prove that the lateral center of gravity limits of the "product" and its crashworthiness aspects conformed to the specifications. With regard to plaintiffs' failure to warn allegations, UTC must prove on this second element that the product warnings provided by UTC were required by the specifications as well as those warnings required of a seller (see pages 26 to 28) that were not, by the control or direction of the Army, prohibited. You may consider evidence in the case of documents which bear the signature of a government representative on the issue of compliance with government specifications, but it is not conclusive proof of such compliance.

With regard to the third element, UTC must prove it disclosed to the Army, or warned the Army of, those hazards involved in the use of the "product" that were actually known by UTC, but were not known by the Army. Whether UTC should have known of a hazard is not an issue that you are allowed to consider in connection with this third element of the special defense. The only thing that matters is actual knowledge. Disclosures of hazards must be communicated in a reasonably effective manner. If, however, the Army knew of a hazard, then UTC did not have a duty to warn or disclose that hazard to the Army.

Jury Charge (Dkt. No. 270) at 44–45. Because UTC bore the burden of proof for its government contractor defense, the jury could have chosen not to credit UTC's witnesses' testimony concerning one or more of these elements. A reasonable jury could have found, from the evidence

---

7. UTC does not, on the instant motion, challenge the jury's finding rejecting its superseding cause or comparative negligence special defenses.

presented at trial, that UTC did not provide any adequate warnings. The jury could have found that UTC should have advised the Army that, with the helicopter in an asymmetric condition, stick margins were degraded and the aircraft might become uncontrollable. Moreover, the jury could have credited the testimony of Charles Crawford that UTC was free to provide additional warnings to the Army. The jury could therefore have found that UTC failed to carry its burden of proof as to the second element of the government contractor defense because UTC did not prove that the Army's contract or specifications prohibited safety warnings beyond those provided by UTC.

 With regard to UTC's alteration/modification defense, the jury was instructed:

A manufacturer is not liable for harm that would not have occurred, but for a third party's alteration or modification of the product in question. "Alteration or modification," as used in the statute and in this charge, includes changes in the design, formula, function or use of the product from that originally designed, tested or intended by the product seller. In order to find that UTC is not liable, the alteration or modification must be the sole proximate cause of plaintiffs' injuries.

UTC asserts that the Army altered or modified the "product" in that the ESSS system was originally designed, jettison tested and intended for two purposes: self-deployment so the aircraft could be flown to Europe and a demonstration of the Hellfire missile. UTC assets that, by the Army using the ESSS system for purposes other than these two, the Army altered or modified the ESSS system.

This defense does not apply if the alteration or modification: 1) was in accordance with the manufacturer's instructions or specifications; 2) was made with the manufacturer's consent; or 3) was the result of conduct that the manufacturer reasonably should have anticipated. UTC asserts that it never instructed in, consented to, or anticipated that the ESSS system would be altered or modified.

*Id.* at 49–50. The jury heard evidence that UTC was aware that the Army was using the ESSS-equipped helicopter on an "everyday" basis. This would provide one basis on which a reasonable jury could find that UTC had failed to carry its burden of proof on its alteration/modification defense. Moreover, the jury could have found, based on the evidence presented at trial, that the crash was not caused by the Army's using the ESSS-equipped Blackhawk helicopter on an "everyday" basis.

The court finds that judgment as a matter of law is not required in UTC's favor because UTC has failed to establish that judgment as a matter of law is required in UTC's favor on its special defenses in order to prevent a manifest injustice. Accordingly, UTC's Motion for Judgment as a Matter of Law (Dkt. No. 285) is denied.

## II. Defendant's Motion for Alteration or Amendment of Judgment and for a New Trial

### A. Standards

 Under Rule 59 of the Federal Rules of Civil Procedure, however, the standard of review is less stringent. Rather than being bound to construe the evidence in the light most favorable to the non-movant, the court may, on a Rule 59(a) motion for a new trial, consider the credibility of the witnesses and the weight of the evidence. However, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."[8] *Caruolo v. John Crane, Inc.,*

---

**8.** The Second Circuit has also stated the following alternative test for deciding a motion

for a new trial pursuant to Fed.R.Civ.P. 59(a):

226 F.3d 46, 226 F.3d 46, 54 (2d Cir.2000) (citation and internal quotation marks omitted). "Rulings on motions under [Rule 59(a) ] are committed to the sound discretion of the district court." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 143 (2d Cir.1998) (citations omitted).

▮▮▮▮▮ "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Caruolo*, 226 F.3d at 54 (citation and internal quotation marks omitted). "Also unlike a motion for judgment as a matter of law, a trial judge considering a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'" *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998) (citation omitted). Nevertheless, "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia*, 983 F.2d at 363 (citations omitted).

▮▮▮▮ In addition to the provision under Fed.R.Civ.P. 59(a) for a motion for a new trial, "Rule 59(e) provides for the altering or amending of a judgment." *Devlin v. Transp. Communications Int'l Union*, 175 F.3d 121, 131 (2d Cir.1999) (citation omitted). "It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa*, 156 F.3d at 144 (citations omitted). Rather, the primary grounds for granting a Rule 59(e) motion to alter or amend are

"an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992) (citations and internal quotation marks omitted); *see also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* Civil 2d § 2810.1 at 121–28 (1995). "A district court has broad discretion in determining whether to grant a motion to alter or amend the judgment." *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir.2000) (citing *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983) (per curiam)).

### B. The jury's verdict is not against the weight of the evidence.

UTC argues that, "[e]ven if the Court concludes that there was legally sufficient evidence to send the case to the jury, the jury's verdict is so far against the weight of the evidence that the interests of justice demand a new trial." Memo. of Law in Support of UTC's Motion for Judgment as a Matter of Law, New Trial, or Alteration or Amendment of Judgment (Dkt. No. 291) at 22. The court notes that it "has … discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (citation and internal quotation marks omitted); *see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir.1998). However, here, as outlined above, the court finds that there is ample

---

Rule 61 sets out a workable test for when to grant a new trial, counseling that no error is ground for granting a new trial "unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. That is to say, a trial court should be most reluctant to set aside that which it has previously decided unless convinced that it was based on a mistake of fact or clear error of law, or that refusal to revisit the earlier decision would work a

manifest injustice. *See Arizona v. California*, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Certainly, a trial court should not grant a new trial simply because, like the proverbial second bite at the apple, the losing party believes it can present a better case if afforded another chance.
*LiButti v. United States*, 178 F.3d 114, 118–19 (2d Cir.1999).

evidence in the record to support the jury's verdict. Even after weighing the credibility of the witnesses itself, the court finds that the testimony of the plaintiffs' witnesses would support the jury's verdict.

Reviewing the evidence presented at trial, the court finds that there is substantial, credible evidence presented at trial to support the jury's verdict for the plaintiffs on their negligent failure to warn theory and against UTC on its special defenses. The court is not persuaded by UTC's attempts to characterize the evidence in its favor and will not second-guess the jury's credibility judgments regarding the fact issues supporting a finding of negligent failure to warn. The court is simply not convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice. As such, UTC's motion for a new trial on the basis that the jury's verdict is against the weight of the evidence is denied.

### C. The jury's verdict is not inconsistent.

 A Rule 59(a) motion for new trial is also an appropriate vehicle for a defendant to challenge a jury verdict on the ground that it is inconsistent. *See Hardy v. Saliva Diagnostic Sys., Inc.,* 52 F.Supp.2d 333, 339–40 (D.Conn.1999). This ground for a new trial arises from the requirement that, "[w]hen a jury returns a verdict by means of answers to special interrogatories, the findings must be consistent with one another, as they form the basis for the ultimate resolution of the action." *Crockett v. Long Island R.R.,* 65 F.3d 274, 278 (2d Cir.1995) (citation omitted). "When confronted with a potentially inconsistent jury verdict, the court must 'adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" *Turley v. Police Dep't of the City of N.Y.,* 167 F.3d 757, 760 (2d Cir.1999) (citation omitted). "Before a court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt 'to reconcile the jury's find-

ings, by exegesis if necessary.'" *Id.* (citations omitted); *see also Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 497 (2d Cir.1995) ("A court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict." (citations omitted)). Thus, "if the answers returned by the jury appear to be inconsistent with one another, '[i]t is the duty of the district court to attempt to harmonize the jury's answers, if it is at all possible under a fair reading of the responses.'" *LeBlanc–Sternberg,* 67 F.3d at 427 (citation omitted). "The court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, ..., and if there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained." *McGuire,* 1 F.3d at 1311 (citations omitted). "The district court should refer to the entire case and not just the answers themselves." *Id.* (citation omitted). This duty "derives from the Seventh Amendment's obligation on courts not to recast factual findings of a jury, ..., and is based on the notion that 'juries are not bound by what seems inescapable logic to judges.'" *Indu Craft,* 47 F.3d at 497 (citations omitted). "If, however, 'the jury's answers cannot be harmonized rationally, the judgment must be vacated and a new trial ordered.'" *Crockett,* 65 F.3d at 278 (citation omitted).

 Where "the district court properly instructed the jury on the elements of plaintiffs' causes of action," the Second Circuit has held that "[t]here is a strong presumption that the jury in reaching its verdict complied with those instructions." *Bingham v. Zolt,* 66 F.3d 553, 563 (2d Cir.1995) (citation omitted). As such, "[a] jury's verdict reached after proper instructions must be upheld where there is a reasonable explanation for the jury's seemingly inconsistent answers." *Id.* Moreover, "[i]n seeking consistency, [the court must] bear in mind that a jury is entitled

to believe some parts, and to disbelieve other parts, of the testimony of any given witness." *Robinson v. Cattaraugus County,* 147 F.3d 153, 160 (2d Cir.1998) (citations omitted).

■ The court has already discussed above its charge instructing the jury that UTC could be held liable for breaching a post-sale duty to warn on the plaintiffs' negligence theory of liability under the CPLA, but not under the plaintiffs' strict liability or breach of implied warranty theories of liability. This distinction provides a reasonable reading of the jury's responses on the Special Verdict Form [Dkt. No. 279]. The jury could find that UTC, but not the Army, was aware, or could have been aware, post-sale of the danger that the ESSS-equipped Blackhawk helicopter could become uncontrollable in asymmetric conditions. This would support a finding that UTC breached its duty to warn only under a negligence theory of liability. Moreover, such a view of the case would preclude the jury from finding for UTC on either UTC's alteration/modification defense, since the jury could conclude the danger was the result of conduct that UTC reasonably should have anticipated, or UTC's government contractor defense, if the jury found that UTC failed to provide adequate warnings of the hazards involved in the use of ESSS-equipped Blackhawk helicopter that were actually known by UTC, but were not known by the Army. Accordingly, the court declines to order a new trial on the ground that the jury's verdict is inconsistent.

### D. The court will not order a remittitur of the damages awarded to Christopher and Wendy Mancini and Major Eric Johnson.

Finally, UTC argues that the court should order a remittitur to reduce the amount of the damages awarded to plaintiffs Christopher Mancini, his wife Wendy Mancini, and Major Eric Johnson. The jury awarded Christopher Mancini compensatory damages of $7,750,000, his wife Wendy compensatory damages for loss of consortium in the amount of $500,000, and Major Johnson $5,000,000 in compensatory damages. *See* Special Verdict Form (Dkt. No. 279) at ¶¶ 19–21. UTC argues that the non-economic damages awarded to the Mancinis and Major Johnson are excessive as a matter of law and that the damage awards of Christopher Mancini and Major Johnson should also be reduced by the $50,000 that these plaintiffs received in a pre-trial settlement with Alcoa, UTC's one-time co-defendant.[9] The court declines to do so.

■ A district court's discretion to order a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini,* 518 U.S. at 433, 116 S.Ct. 2211 (citation and footnote omitted). "[I]n deciding remittitur motions in diversity cases, federal courts apply federal procedural standards and state substantive law." *Imbrogno v. Chamberlin,* 89 F.3d 87, 90 (2d Cir.1996) (citations omitted). The court ruled before the start of trial that damages in the case would be governed by Connecticut law for all the plaintiffs except for Lisa Rhodes Truluck, both in her individual capacity and as executor of the Estate of Specialist Gary Rhodes, Jr. Thus, in deciding on UTC's request for a remittitur, the court must "look[ ] to Connecticut substantive law to determine whether the jury award was excessive" as a matter of law in comparison to other non-economic damage awards in similar case and "in light of the plaintiffs' settlement with" Alcoa. *Id.* "Under Connecticut law; a court may grant remittitur only when the jury verdict is excessive as a 'matter of law.'" *Id.* (citing *Peck v. Jac-*

---

9. For reasons discussed more fully below, the court interprets UTC's motion regarding a reduction for the pre-trial settlements with Alcoa as applying only to Christopher Mancini and Major Eric Johnson.

quemin, 196 Conn. 53, 69, 491 A.2d 1043 (1985), and *Mauro v. Yale–New Haven Hosp.,* 31 Conn.App. 584, 587–88, 627 A.2d 443 (1993)).

■ Federal law, however, governs the procedure governing remittitur motions. In this context, the Second Circuit has held that, "[i]f the district court concludes, after examining and comparing similar jury awards in Connecticut, that the verdict in the instant case is excessive as a matter of law, it should order a new trial on the issue of damages, unless the plaintiffs agree to remit that portion of the jury verdict deemed excessive." *Id.* (citations omitted).[10]

■ With regard to the effect of a prior settlement on a jury's damage award to the plaintiffs, Conn.Gen.Stat. § 52–216a provides:[11]

An agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of the cause of action against any other joint tortfeasors, nor shall any other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury. If the court at the conclusion of the trial concludes that the verdict is

excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. As the Connecticut Appellate Court has aptly summarized in *Mauro v. Yale–New Haven Hosp.,* the Connecticut Supreme Court held in *Peck v. Jacquemin* that section 52–216a should be interpreted to "permit[ ] the verdict to be reduced by amounts received by a plaintiff from other joint tortfeasors only when those additional amounts plus the verdict would produce an excessive amount of damages as a matter of law." *Mauro,* 31 Conn.App. at 588, 627 A.2d 443; *see also Peck,* 196 Conn. at 71, 491 A.2d 1043 ("In making its postverdict determination on the issue of any claimed excessiveness or inadequacy, the trial court was directed to consider the amount of money paid to a plaintiff as the result of either '[any] agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action.'" (quoting Conn.Gen.Stat. § 52–216a)). Following *Peck,* courts have held that, under this statute, the court must "determine if the jury verdict, when added to the settlement, was excessive as a matter of state law." *Imbrogno,* 89 F.3d at 90 (citations omitted); *see also Black v. Goodwin, Loomis & Britton, Inc.,* 239 Conn. 144, 167–68, 681 A.2d 293 (1996) (affirming

---

**10.** Accordingly, the court finds that the Second Circuit has foreclosed the court from finding that Fed.R.Civ.P. 59(e) dictates that the court should simply reduce the amounts of the damages awarded to each plaintiff, as UTC claims. *See* Memo. of Law in Support of UTC's Motion for Judgment as a Matter of Law, New Trial, or Alteration or Amendment of Judgment (Dkt. No. 291) at 31 & n. 30. As such, the court will follow UTC's express request that, "[i]f … the Court concludes that any adjustment for the Alcoa settlements must be done by remittitur, UTC seeks such relief only as to Mancini and Johnson." *Id.* at 31 n. 30. Thus, because the court finds that it must apply a remittitur and not a simple reduction, the court will consider UTC's request for a remittitur of the damages awarded to Christopher Mancini and Major Johnson, and not the other plaintiffs.

**11.** In accordance with the express terms of this statute, the court granted a pre-trial motion in limine by the plaintiffs to exclude evidence at trial of the plaintiffs' pre-trial settlement with Alcoa. *See* Plaintiffs' Motion in Limine Regarding Prior Settlement and Incorporated Memorandum of Law (attached as Ex. 3 to Joint Pre–Trial Order [Dkt. No. 171]); *see also* UTC's Memorandum of Law in Opposition to Plaintiffs' Motion in Limine Regarding Prior Settlement (Dkt. No. 173) at 1 ("UTC does not oppose plaintiffs' motion with respect to excluding evidence of settlement with Alcoa from the jury. However, if plaintiffs prevail at trial on liability and are awarded damages, UTC will seek a reduction of the verdict by the Court based on plaintiffs' settlement with Alcoa.").

a trial court's application of this procedure for deciding on remittitur); *Hoffman v. McNamara*, 688 F.Supp. 830, 834 (D.Conn. 1988) ("In fact, Conn.Gen.Stat. § 52–216a requires that: '[i]n making its post verdict determination on the issue of any claimed excessiveness or inadequacy, the trial court [is] directed to consider the amount of money paid to a plaintiff as the result of either '[any] agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action.'" (quoting *Peck*, 196 Conn. at 71, 491 A.2d 1043 (quoting Conn.Gen.Stat. § 52–216a))).

UTC, however, claims that the Connecticut Supreme Court's holding in *Alfano v. Ins. Ctr. of Torrington*, 203 Conn. 607, 525 A.2d 1338 (1987), abrogated the Connecticut Supreme Court's prior interpretation of the operation of section 52–216a in *Peck v. Jacquemin*, 196 Conn. at 69–71, 491 A.2d 1043. UTC argues that *Alfano* requires the court to order an automatic reduction of a jury verdict by the amount of any pre-trial settlement as a matter of law, obviating any need for the court to engage in an excessiveness analysis. UTC relies on the Connecticut Supreme Court's finding in *Alfano* that:

> [i]t can hardly be disputed that in this case the award of $19,500 to the plaintiff was excessive as a matter of law, because, when the $15,000 received in the settlement with his attorney is added to that sum, the plaintiff would receive total compensation of $34,500. This amount is $4500 greater than the jury's finding of $30,000 as the amount of the plaintiff's loss from the fire.

203 Conn. at 611, 525 A.2d 1338.

In assessing UTC's argument, the court finds the reasoning of the Connecticut Appellate Court in *Mauro* persuasive and thus rejects UTC's claim. *See* 31 Conn. App. at 588–89, 627 A.2d 443 (finding that the rule in *Peck* was not altered by the holdings of *Alfano*, 203 Conn. 607, 525 A.2d 1338; *Ames v. Sears, Roebuck & Co.*, 206 Conn. 16, 536 A.2d 563 (1988), and *Yuzari v. S. Auto Sales*, 688 F.Supp. 825 (D.Conn.1988)). The Appellate Court in *Mauro* distinguished the holding of *Alfano* by noting that:

> *Peck* involved a jury award for damages for personal injuries while *Alfano* involved a jury award for a fire loss to property. The payment made by another in *Alfano* was not by a joint tortfeasor but by an attorney, arising out of his malpractice for failing to advise the plaintiff of the need for fire insurance. The loss in *Alfano* was readily ascertainable and absolute, and "represent[ed] a legally unassailable determination of fair compensation for the plaintiff's loss...."
> ... Although the amount of the jury award in *Peck* was certain, it was not absolute because it was within a spectrum of possible sums that could be awarded as just damages.... Because of the nature of personal injuries and the pain and suffering ancillary to the injuries, the amount awarded by a jury is not absolute. The amount of the loss in *Alfano* was fixed, and, therefore, any recovery beyond the jury verdict would necessarily be excessive. Thus, there was no reason for the court in *Alfano* to exercise the limited role given to it by § 52–216a.

31 Conn.App. at 589, 627 A.2d 443 (citations and footnote omitted). Indeed, the *Alfano* court itself noted that, *"[u]nder the unique circumstances of this case*, the choice made by the trial court in order to comply with the statutes directing a remittitur before ordering a new trial where a verdict is excessive was appropriate." 203 Conn. at 615, 525 A.2d 1338 (emphasis added) (citation omitted). The court's reliance on the reasoning of *Mauro* in distinguishing *Alfano* from *Peck* and the instant case is further bolstered by the Connecticut Supreme Court's decision in *Black*, 239 Conn. at 167–68, 681 A.2d 293, in which the Supreme Court affirmed a trial court's decision denying a remittitur of damages based on personal injuries after applying the *Peck* procedure. Accordingly, the court finds that the holding of the court in

*Alfano,* finding that a remittitur was required because the sum of a settlement and jury verdict was excessive as a matter of law, should be limited to the facts of that case or at least to cases involving finite sums, such as property damage, and not matters involving non-economic damages for personal injury, such as pain and suffering.

Turning to the excessiveness inquiry in the instant case, both as a matter of law and as to a possible reduction by the amount of the Alcoa settlement, the court observes that, in determining if a damage award is excessive, the Connecticut Supreme Court has held that:

> [t]he amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury.... The size of the verdict alone does not determine whether it is excessive. "The only practical test to apply to this verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption."

*Gaudio v. Griffin Health Servs. Corp.,* 249 Conn. 523, 551, 733 A.2d 197 (1999) (citations omitted); *see also Ham v. Greene,* 248 Conn. 508, 536, 729 A.2d 740 (1999) (quoting *Mather v. Griffin Hosp.,* 207 Conn. 125, 138–39, 540 A.2d 666 (1988)). As the Connecticut Appellate Court has summarized, " '[t]he amount of damages in any given case is dependent on the facts and circumstances of that case.' " *Marchetti v. Ramirez,* 40 Conn.App. 740, 750, 673 A.2d 567 (1996) (quoting *Wochek v. Foley,* 193 Conn. 582, 587, 477 A.2d 1015 (1984)). "An award by a jury may range from penurious to generous and may be set aside only when it is contrary to the law or evidence." *Id.* (citing *American National Fire Ins. Co. v. Schuss,* 221 Conn. 768, 774, 607 A.2d 418 (1992)). Thus, a jury verdict's damage "award should be sustained if it does not shock the sense of justice or the conscience of the court." *Id.* (citing *Herb v. Kerr,* 190 Conn. 136, 139, 459 A.2d 521 (1983)). "The award of damages for pain and suffering is peculiarly within the province of the trier, and will be sustained, even though generous, if it does not shock the sense of justice." *Manning v. Michael,* 188 Conn. 607, 616, 452 A.2d 1157 (1982) (citing *Camp v. Booth,* 160 Conn. 10, 12–13, 273 A.2d 714 (1970)).

Applying this standard, the court finds that the non-economic damages awarded to the Mancinis and Major Johnson are not excessive as a matter of law. Moreover, in accordance with Conn.Gen. Stat. § 52–216a, as interpreted by the Connecticut Supreme Court in *Peck,* the court finds that the sum of $50,000 added to Christopher Mancini's and Major Johnson's damage awards does not shock the court's sense of justice and therefore will not support a remittitur.

Under Connecticut law, "[a] plaintiff is entitled to recover as damages 'the award of an amount based on the destruction of the capacity to carry on life's activities, as well as compensation for conscious pain and suffering.' " *Bartholomew v. Schweizer,* 217 Conn. 671, 686, 587 A.2d 1014 (1991) (citations omitted). For an award of non-economic damages for past and future pain and suffering, "[p]roper compensation cannot be computed by a mathematical formula, and there is no iron-clad rule for the assessment of damages." *Manning,* 188 Conn. at 616, 452 A.2d 1157 (citation omitted).

In the instant case, the court instructed the jury, with regard to damages for Christopher Mancini and Major Johnson, that, "[i]n personal injury actions, damages are assessed up to the date of trial, and include medical expenses as well as all future, as well as past, pain and suffering." Jury Charge (Dkt. No. 270) at 68. The court then gave the following charge, in

full, on these plaintiffs' non-economic damages:

Plaintiffs Christopher Mancini and Major Eric Johnson also claim damages for the injuries they received, for their pain and suffering, and for their reduced ability to pursue and enjoy life's activities. The rule is that, insofar as money can do it, the plaintiffs are to be awarded fair and just compensation for the injuries they have suffered. It is for you, in the exercise of your best judgment, to say what is fair and just compensation to them. There is no fixed rule you can apply. You have to apply sound common sense in determining the amount of your verdict. If you find that the defendant is liable in this case, you must award fair, just, and reasonable damages to these two plaintiffs for any pain and suffering they have experienced from February 23, 1993, to today, as a proximate result of the UTC's conduct. Also, you must award compensation to each of these two plaintiffs for this element of damages for any pain and suffering that they will experience for the remainder of his life as a result of this incident. Pain and suffering are proper elements of an injured party's damages that you are to consider. I instruct you that, in addition to physical pain, emotional anguish is also compensable.

Plaintiffs Christopher Mancini and Major Eric Johnson also seek compensation for the disruptions on their ordinary life activities caused by their injuries. They claim they will suffer from the after-effects of their injuries for the rest of their lives. If you are convinced of such disruption by a preponderance of the evidence, then you should award damages for these permanent injuries.

To establish a claim of physical pain and suffering or of mental anguish or suffering, the plaintiffs must prove by a preponderance of the evidence that a plaintiff suffered such type of damages. The determination of the amount of these damages is solely within your province.

In determining all future damages, you should take into account the probable duration of each plaintiff's life. You should also consider the particular condition of strength, health, and physical stamina as bearing upon the probable duration of their lives, whether longer or shorter than the average persons in like circumstances.

Wendy Mancini has also asserted a loss of consortium claim as a consequence of her husband's injuries. This claim is separate from the claims made by her husband, Christopher Mancini. The term "consortium" is defined as encompassing the services of the injured spouse, and the variety of intangible relations which exist between spouses living together in marriage. These intangibles are generally described in terms of affection, society, companionship, and sexual relations.

*Id.* at 68–70.

The court observed the testimony of all the witnesses at trial, including the Mancinis and Major Johnson. There was substantial witness testimony of the pain and suffering of the plaintiffs and direct evidence of the condition that both Christopher Mancini and Major Eric Johnson have endured and continue to endure. The jury both heard and saw ample evidence of the condition of both men following the crash of the Blackhawk helicopter and up to and including the time of trial.[12] Both men suffered second- and third-degree burns to several parts of their bodies, and their faces were seriously injured. Both men have undergone extensive reparative and plastic surgery. Both men's injuries have had a substantial effect on their ability to carry out the activities in which they engaged prior to the accident. Moreover, Wendy Mancini testified to the

---

**12.** There are photographs in the record depicting Christopher Mancini's and Major Johnson's condition prior to trial and closer to the time of the crash.

physical and psychological pain and suffering her husband has experienced.

The damage awards in the Connecticut cases cited by UTC in its Memorandum of Law in Support of its Motion for Judgment as a Matter of Law, New Trial, or Alteration or Amendment of Judgment [Dkt. No. 291] do not change the court's conclusion that the damages awarded to these plaintiffs are not excessive as a matter of law. *See* Memo. of Law in Support of UTC's Motion for Judgment as a Matter of Law, New Trial, or Alteration or Amendment of Judgment (Dkt. No. 291) at 25–31 (collecting cases). Having heard the witnesses' testimony at trial and seen Christopher Mancini's and Major Johnson's conditions at trial and in photographs, the court finds "that the jury's award[s] may have been generous, but that they nevertheless fall[ ] 'somewhere within the necessarily uncertain limits of just damages.'" *Bartholomew*, 217 Conn. at 688–89, 587 A.2d 1014.

Moreover, the addition of $50,000 from the plaintiffs' pre-trial settlement with Alcoa to both the $5,000,000 awarded to Major Johnson and the $7,750,000 awarded to Christopher Mancini does not alter the court's judgment that these damage awards are not excessive. The court finds that $5,050,000 and $7,800,000 as compensation for the past and ongoing injuries and pain and suffering endured by Major Johnson and Christopher Mancini, respectively, as described above, fall well within the range of just damages and do not in any way shock the court's conscience and sense of justice. Accordingly, the court will decline UTC's request for a remittitur in this case.

### III. CONCLUSION

The court finds that UTC has failed to carry its burden of demonstrating its entitlement to judgment as a matter of law or, alternatively, to a remittitur or new trial. As such, UTC's motions for judgment as a matter of law under Rule 50(b) and, alternatively, for a new trial under Rule 59(a) and to alter or amend the judgment under Rule 59(e) [Dkt. No. 285] is DENIED.

**SO ORDERED.**